# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| R.J. Zayed, in his Capacity as Court-Appointed Receiver for Trevor G. Cook, et al., | Civil No. 11-CV-1042 (SRN/FLN) |
| **Petitioner,** | [SEALED] MEMORANDUM OPINION AND ORDER |
| v. | |
| David Buysse, Steven and Pamela Cheney, Walter Defiel, Terry Frahm, Steven and Jenene Fredell, Michael and Jennifer Heise, Michael and Cynthia Hillesheim, Larry Hopfenspirger, Steven Kautzman, James McIntosh, George and Karen Morisset, Reynold Sundstrom, and Dot Anderson, | |
| **Respondents.** | |

___

R.J. Zayed, Tara C. Norgard, Russell J. Rigby, Brian W. Hayes, Peter M. Kohlhepp & Marlee A. Jansen, Carlson, Caspers, Vandenburgh & Lindquist, 225 S. Sixth Street, Minneapolis, Minnesota, 55402, for Petitioner

William F. Mohrman, Gregory M. Erickson & James R. Magnuson, Mohrman & Kaardal, P.A., 33 South Sixth Street, Suite 4100, Minneapolis, Minnesota 55402, for the Investor Respondents

Adam S. Huhta, Huhta Law Firm, PLLC, 36 South Ninth Street, Suite 200, Minneapolis, Minnesota 55402, for Respondent Anderson

___

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on the parties' cross motions for summary

judgment [Doc. Nos. 187, 192 & 200].[1]  Also before the Court are Petitioner's Motion to

Exclude Expert Testimony [Doc. No. 228] and the Motion to Exclude Expert Testimony

filed by Respondent David Buysse, et al. (hereinafter, collectively, the "Investor

Respondents") [Doc. No. 231].  For the reasons set forth herein, Petitioner's Motion for

Summary Judgment is granted in part and denied in part, the Investor Respondents'

Motion for Summary Judgment is denied, and Dot Anderson's Motion for Summary

Judgment is denied.  The cross motions to exclude expert testimony are granted.

## I.    BACKGROUND

This case arises out of a $158 million Ponzi scheme operated by Trevor Cook.[2]

Cook solicited investors to participate in a fabricated foreign currency trading program.

The program was marketed to investors as risk-free and guaranteed to earn a 10-12%

return on principal.  (Cook Plea Agreement at 2, Ex. 1 to Corrected Declaration of Marlee

A. Jansen ("Jansen Decl.") [Doc. No. 196].)

Cook, who subsequently pled guilty to one count of mail fraud and one count of

tax evasion (see Sentencing Judgment of 8/25/10 [Doc. No. 18], United States v. Cook,

10-CR-75 (JMR)), worked with business partners Bo Beckman, Pat Kiley, Gerald Durand

---

[1]  Petitioner's Motion for Summary Judgment [Doc. No. 192] seeks summary
judgment against all Respondents.

[2]  A "Ponzi Scheme" generally describes a fraudulent investment scheme in which
money taken from later participants is paid to earlier participants to create the false
appearance that the scheme is generating returns.  See Cunningham v. Brown, 265 U.S. 1,
7–9 (1924) (describing the schemes of Charles Ponzi).

and Chris Pettengill.[3]  (Cook Dep. at 71, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)   Cook

operated various entities in connection with his Ponzi scheme, including Oxford Global

Advisors/Oxford Global Partners ("Oxford") and UBS Diversified/Universal Brokerage

FX ("UBS")[4] (collectively, the "Cook Currency Entities"), and Crown Forex.  (Id. at 62,

71; Decl. of Scott J. Hlavacek ¶¶ 11-15, Ex. 2 to Jansen Decl. [Doc. No. 197].)   Cook

made various representations to Respondents and other potential investors about investing

in the "carry trade" in foreign currency markets.  (Cook Dep. at 36-37, Ex. 8 to Jansen

Decl. [Doc. No. 197-5].)  In his deposition in this case, Cook testified that the "carry

trade" involves borrowing currencies with low interest rates, such as the Japanese yen,

and purchasing instruments in currencies with high interest rates, such as the British

pound. (Id.)  Theoretically, the purchaser of the two currencies would pay the lower

interest amount and collect the higher interest amount, earning a profit equal to the

difference between the two interest rates.  (Id.)  Cook represented that he would earn

greater returns by leveraging the monies used to make significant currency trades, with

the highest yielding currency held long versus the lowest yielding currency held short.

---

[3]  Cook's business partners have pled guilty or been convicted of fraud-related
charges in connection with their respective  roles in Cook's Ponzi scheme.   Pettengill
pled guilty on June 21, 2011 (United States v. Pettengill, 11-CR-192 (MJD), Plea
Agreement [Doc. No. 6]), and Beckman, Kiley, and Durand were convicted on June 12,
2012, following a jury trial (United States v. Beckman, et al., 11-CR-228 (MJD/JJK),
Jury Verdicts [Doc. Nos. 303, 305, 307].)

[4]  Trevor Cook's UBS entities had no affiliation to the global provider of financial
services, UBS, AG.

(Cook Brochure, Ex. 3 to the Declaration of James R. Magnuson ("Magnuson Decl.")

[Doc. No. 203-3].)  Cook's promotional literature proclaimed, "The utilization of both our

exclusive technology and unparalleled banking relationships negate all currency risks."

(Id.)

In total, over 700 people invested in Cook's Ponzi scheme.  (Receiver's First Am.

Final Clams List at 13, Ex. 11 to Jansen Decl. [Doc. No. 194-1].)  Clifford Berg, Cook's

father-in-law, directly or indirectly solicited investments from all but one of the

Respondents in this action.  The "Berg Investors" fall into three categories: (1) personal

friends of Cliff Berg or his wife, Ellen; (2) people who knew Berg from the carpet

business; or (3) close friends of people in the second category.  (Pet'r's Mem. Supp. Mot.

Exclude Adams Testimony at 6 [Doc. No. 247].)[5]  Specifically, David Buysse, Steven and

Pamela Cheney, Walter Defiel, John Dzik, Terry Frahm, Steven and Jenene Fredell,

William Harris, Michael and Jennifer Heise, Michael and Cynthia Hillesheim, Larry

Hopfenspirger, Steven Kautzman, James McIntosh, George and Karen Morisset, and

Reynold Sundstrom made their Cook investments through their connections with Berg.[6]

 Berg received commissions for bringing in these investors.  (G. Berg Dep. at 32, Ex. 9 to

---

[5]   The Court's citation to page numbers in the parties' memoranda are to the page
numbers found on the docket entry on the top of each page, as opposed to page numbers
found on the bottom of the parties' respective memoranda.

[6]   Dzik and Harris settled their claims with the Receiver and are no longer part of
this action.  (Dzik Settlement and Stipulation, Ex. 197-54 to Jansen Decl.; Notice of
Dismissal as to Harris [Doc. No. 181].)

Jansen Decl. [Doc. No. 197-6]; McIntosh Dep. at 103, Ex. 150 to Jansen Decl. [Doc. No. 197-40]; J. Fredell Dep. at 78-79, Ex. 57 to Jansen Decl. [Doc. No. 197-27].)   Many of the Investor Respondents were aware that Berg was Trevor Cook's father-in-law.

Unlike the Investor Respondents, Respondent Dot Anderson invested in Cook's scheme through her grandson, Grant Grzybowski.  Grzybowski worked for Cook. (Grzybowski Dep. at 20-21, Ex. 13 to Jansen Decl. [Doc. No. 197-8].)   Cook initially testified that he considered the investors in his currency trading program to be "well below average level of sophistication," although he noted that some investors were other hedge funds, which he described as having "extremely high sophistication levels."  (Cook Dep. at 95, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)   Accordingly, he testified that the sophistication level of the investors was widely varied.  (Id.)

Respondents provided capital for Cook to make foreign currency trades.[7]  In his criminal plea agreement, Cook admitted that he withheld from investors the fact that he

---

[7]  In their memoranda filed in connection with the instant motions, the Investor Respondents characterize themselves as lenders, and the provision of their money to Cook as loans.  Without parsing the semantics or attaching great significance to the terminology, the Court will simply refer to Respondents as "investors," and the provision of Respondents' money to Cook as "investments."  This usage is consistent with Cook's criminal proceedings, which refer to "investors" in Cook's scheme.  (See Plea Agreement at 2, Ex. 1 to Jansen Decl. [Doc. No. 196].)  It is also consistent with the testimony of some of the Investor Respondents, who either understood their provision of funds to the Cook Currency Entities to be an investment, rather than a loan, or testified that they never heard Cook refer to it as a loan.  (M. Heise Dep. at 254-55, Ex. 39 to Jansen Decl. [Doc. No. 197-24]; Buysse Dep. at 61, Ex. 158  to Jansen Decl. [Doc. No. 197-42]; S. Fredell Dep. at 165, Ex. 56 to Jansen Decl. [Doc. No. 197-26]; J. Fredell Dep. at 76, Ex. 57 to Jansen Decl. [Doc. No. 197-27].)

diverted their funds for other purposes including: (1) making payments of interest and principal to other investors; (2) purchasing an ownership interest in two trading firms; (3) working on real estate development in Panama; (4) paying personal expenses; (5) acquiring his Minneapolis headquarters, the Van Dusen Mansion; and (6) providing funds to Crown Forex, SA in an effort to deceive Swiss banking regulators. (Plea Agreement at 3, Ex. 1 to Jansen Decl. [Doc. No. 196].)

On June 22, 2009, the Securities and Exchange Commission ("SEC") conducted an on-site investigation at the Van Dusen Mansion into Cook's activities. (Grzybowski Dep. at 164, Ex. 13 to Jansen Decl. [Doc. No. 197-8]; Cook Dep. at 78, 87-88, Ex. 8 to Jansen Decl. [Doc. No. 197-5].) Berg heard about the investigation and tried to ask his son-in-law about it, although he did not reach him immediately. (Cook Dep. at 77-78, Ex. 8 to Jansen Decl. [Doc. No. 197-5].) One of Cook's associates, possibly Eric Erickson, told Berg that the SEC was conducting a routine audit. (Id.) After learning that Berg had inquired about the SEC investigation, Cook followed up with Berg. (Id. at 78.) Cook informed Berg that the SEC was conducting an investigation, not an audit, because, "I couldn't lie to him." (Id.) It was Cook's understanding that, as of June 22, 2009, the SEC investigation included an investigation into his currency trading entities, although he did not share this specific information with his father-in-law, and told Berg, "I don't know what's going on." (Id.) Upon learning of the investigation, Berg told Cook that he wanted to close all of his clients' accounts, as well as his own. (Id. at 78, 138, 144; Cook Dep. at 169, Ex. 12 to Jansen Decl. [Doc. No. 194-1]; Cook Dep. at 294-95, Ex. 14 to

Jansen Decl. [Doc. No. 194-1].)  Cook testified that he and his father-in-law had an agreement that if there were ever any problems with the investment program, Berg and his group of investors could cash out.  (Cook Dep. at 168, Ex. 12 to Jansen Decl. [Doc. No. 194-1].)

On June 29, 2009, Cook directed his colleagues to withdraw funds to be distributed to the Investor Respondents.  Specifically, Cook instructed his assistant, Julia Smith Gilsrud, to withdraw funds from an Associated Bank account for which Ms. Smith Gilsrud was authorized to make withdrawals.  (Cook Dep. at 154-55, Ex. 8 to Jansen Decl. [Doc. No. 197-5]; Associated Bank Withdrawal Slip and Cashier's Checks, Ex. 15 to Jansen Decl. [Doc. No. 194-1].)  Cook testified that while his own name was not on the Associated Bank account, he directed Smith Gilsrud to draw fourteen cashier's checks on this account for the purpose of processing some of the Berg investors' withdrawals. (Id.)  Smith Gilsrud withdrew $3,223,600 from the Associated Bank Account and obtained fourteen cashier's checks.  (Withdrawal Slip and Cashier's Checks, Ex. 15 to Jansen Decl. [Doc. No. 194-1].)  Cook also directed his partner, Pat Kiley, to withdraw funds from a Wells Fargo account to cover distributions to Berg and the remaining Berg investors.  (Cook Dep. at 942, Ex. 18 to Jansen Decl. [Doc. No. 194-1].)  Again, Cook's name was not on the Wells Fargo account, thus he dispatched Kiley.  (Id.)  On June 29, Kiley withdrew $3,672,672 from the Wells Fargo account and obtained eleven cashier's checks.  (Wells Fargo Withdrawal Slip and Cashier's Checks, Ex. 16 to Jansen Decl. [Doc. No. 194-1].)  For the most part, Berg himself conveyed the checks to the Investor

Respondents and told many of the Investor Respondents that he had closed their accounts because of an investigation or audit. When Berg deposited his own cashier's checks, he told the branch manager that he was "trying to help his son-in-law." (Hearing Transcript of 12/4/09, United States Commodity Futures Trading Comm'n v. Cook, 09-CV-3332, at 37-38, 41, Ex. 10 to Jansen Decl. [Doc. No. 197-7].) He subsequently transferred those funds through multiple accounts at different institutions before they were traced by the Receiver and frozen.[8] (Decl. of Alexandra J. Olson ¶¶ 5-23, Ex. 38 to Jansen Decl. [Doc. No. 197-23].)

Cook testified that even after the SEC investigation was underway, the Cook Currency Entities continued to accept more money from investors:

> Q:      After the SEC investigated – came to your business premises on June 22nd, 2009, did the Cook currency trading entities accept any more money for trading?
>
> A:      I'm sure they did. I don't recall exactly when we stopped taking money. But money was coming in pretty much [every day]. That money was deposited [every day] and so I probably wouldn't have had – hadn't spoken to any of [the] attorneys yet, so I'd imagine, yes, we were taking money in after the SEC showed up.

(Cook Dep. at 87, Ex. 8 to Jansen Decl. [Doc. No. 197-5].) While Cook was unsure of the precise date on which the currency entities stopped taking investments, he believed

---

[8]      In connection with general investigations into the Cook Entities and with respect to the instant receivership action, Berg has refused to testify and has invoked his Fifth Amendment right against self-incrimination. (Decl. of Richard L. Ostrom ¶ 8 [Doc. No. 198]; Decl. of Tara C. Norgard ¶ 2 [Doc. No. 199].)

that it was around the time that the checks were issued to Cliff Berg's investors, the

Investor Respondents. He testified that "we would have stopped taking money about that

time. I mean, maybe it went for a week or I mean, I - I don't know. . . . . It certainly

wouldn't have been months or anything like that." (Id. at 88-89.) Cook also testified that

the purpose of issuing the checks to the Investor Respondents was not to induce

additional investment into the currency trading entities, stating, "It certainly was not to

induce more money. You know, Cliff had asked me. I had always had an agreement with

Cliff. Every withdrawal up to a point was processed as fast as possible." (Id. at 89.)

On July 7, 2009, a group of Cook investors including Howard and Sharon Phillips

(the "Phillips Investors"), filed a lawsuit against Cook, his colleagues, and various Cook

Entities in this Court, alleging claims of breach of contract, fraud, negligent

misrepresentation and violation of various Minnesota consumer protection statutes. (See

Phillips v. Cook, Second Am. Compl., 09-CV-1732 [Doc. No. 122], Ex. 5 to Jansen Decl.

[Doc. No. 197-2].) Among other things, the Phillips Investors alleged that the defendants

failed to return their investments when the investors sought to close their accounts. (See

id. ¶ 54.) The Phillips had tried to close their accounts on June 4, 2009. (Id. ¶¶ 111-12.)

The Star Tribune reported on the Phillips' lawsuit in a July 9, 2009 article, noting

that this Court had issued a temporary restraining order, freezing the assets in several of

the defendants' bank accounts. (Dan Browning, Twin Cities Advisers Accused of Fraud,

Mismanagement, Star Tribune, 7/9/09, Ex. 8 to Decl. of Adam S. Huhta [Doc. No. 190-

8].) As discussed in greater detail herein, Respondent Dot Anderson read this article and

contacted her grandson, Cook's employee, seeking the return of her investment.

On November 23, 2009, the SEC and the Commodity Futures Trading Commission ("CFTC") filed separate lawsuits against Cook, his partner Patrick Kiley, and several of the Cook Entities alleging they had "engaged in a massive investment fraud." (Compl. ¶ 1 [Doc. No. 1], United States Commodity Futures Trading Ass'n v. Cook ("CFTC Case"), 09-CV-3332 (MJD/FLN) (D. Minn.); United States Securities and Exch. Comm'n v. Cook ("SEC Case"), 09-CV-3333 (MJD/FLN) (D. Minn.). Also in November 2009, this Court created a receivership in the SEC and CFTC cases to preserve and apportion any assets involved in Cook's Ponzi scheme on behalf of the victims of the fraud. (See Order of 11/23/09 [Doc. No. 21], CFTC Case.) R.J. Zayed was appointed as Receiver and given "full power to sue" in order to perform all acts necessary to preserve the value of the assets. (Id. at 6-7.) On July 20, 2010, the Court entered an Order granting the Receiver permission to commence summary proceedings within the SEC and CFTC cases to recover Receivership assets transferred to third parties. (Orders of 7/20/10 [Doc. No. 380], SEC Case; [Doc. No. 350], CFTC Case.)

On January 27, 2010, Chief Judge Michael J. Davis issued an Order in the SEC and CFTC cases regarding attorney's fees to which Respondents cite in support of the instant motions. In his Order, Judge Davis clarified that asset freeze orders in the SEC and CFTC cases did not apply to fees that Cook, Kiley and various Cook Entities paid their attorneys pursuant to non-refundable, earned-upon-receipt or flat fee agreements. (See Order of 1/27/10, CFTC Case, 09-CV-3332 [Doc. No. 186].) Judge Davis found

that, at the time the fee retainer agreements were entered into, the SEC's and CFTC's investigations had only started and no criminal proceedings or civil receivership had commenced.  (Id. at 8.)  "Under these circumstances, the Court will not find that counsel knew or should have known that the source of the funds paid were from a fraudulent scheme."[9]  (Id.)

On July 23, 2010, the Receiver filed a petition for the return of alleged receivership assets from all Respondents. (Pet. [Doc. No. 1].)  The Petition concerns the transfer of assets to the Respondents that occurred on or after June 29, 2009.  (Id. at 3.)  It is the Petitioner's position that transfers made through accounts owned or controlled by Cook were made with the intent to hinder, delay or defraud creditors.   In this case, the "creditors" are other investors in the Receivership entities.  Petitioner contends that the Respondents did not receive the disputed  transfers in good faith.  Thus, the Petitioner asserts two claims for relief against Respondents: (1) that each transfer made to Respondents on or after June 29, 2009 was a "fraudulent transfer as to the other investors defrauded by the scheme" pursuant to Minn. Stat. § 513.41, et seq.; and (2) that "[e]ach Respondent has been unjustly enriched by the receipt of the preferential transfers from Receivership Entities made on or after June 29, 2009."  (Id. at ¶¶ 42, 44.)     The Receiver alleges that at some point after mid-June 2009, Cook became aware that his collapsing

---

[9]  The Court found that where an attorney reasonably relies on a client's representations about the source of the client's funds, and the attorney provides services for a reasonable fee, the attorney is entitled to retain the funds.  (Id. at 8-9) (citing Nat'l Credit Union Admin. Bd., 133 F.3d 1097, 1102-03 (8th Cir. 1998))

Ponzi scheme was under investigation, and that Respondents consequently received preferential transfers of receivership funds.  (Id. at ¶ 31.)

## A.    Facts Specific to Individual Respondents

### 1.    David Buysse

David Buysse is the owner of Malmquist Home Furnishings, a business selling floor and window coverings and home decor items.  (Buysse Dep. at 6, Ex. 158 to Jansen Decl. [Doc. No. 197-42].)  Over the course of a twenty-year business relationship, Clifford Berg sold approximately $5,000 to $10,000 worth of merchandise to Buysse annually.  (Id. at 52.)   In order to encourage Buysse to invest in the Cook Entities, Berg arranged a meeting between Buysse and Cook at Cook's headquarters.  (Id. at 8, 42-44.)  Buysse recalled reading a positive newspaper article about Cook's investments prior to investing with Cook, but testified that it did not influence his decision to invest in the Cook Entities.  (Id. at 62.)

 From November 2007 through July 2008, Buysse invested over $320,128.15 in Cook's purported foreign currency trade, with a promised return rate of 10%.  (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]; Berg Investors' Fourth Am. Resps. to Pet'r's Disc. Reqs. at 11, Ex. 34 to Jansen Decl. [Doc. No. 197-20]; Buysse Dep. at 11, Ex. 158 to Jansen Decl. [Doc. No. 197-42].)  Included in the $320,128.15 total was a $50,000 cash deposit that Buysse made in the form of 500 one-hundred dollar bills given to Berg.  (Buysse Dep. at 93-94, Ex. 158 to Jansen Decl. [Doc. No. 197-42].)  Buysse did not receive a receipt for this cash investment, although he saw it noted on an

account statement.  (Id. at 94-95.)

Buysse signed agreements with Cook Entities Oxford and Crown Forex that required the party terminating the account to provide written notice.  (Buysse Client Application Form, Ex. 159 to Jansen Decl. [Doc. No. 194-3]; Buysse Oxford Agreement, Ex. 160 to Jansen Decl. [Doc. No. 194-3]; Buysse Crown Forex Agreement, Ex. 162 to Jansen Decl. [Doc. No. 194-3].)  In late June 2009, Berg notified Buysse by phone that the fund was no longer accepting deposits, would soon be closed, and that a check distributing the contents of Buysse's account would be mailed shortly.  (Buysse Dep. at 13-14, Ex. 158 to Jansen Decl. [Doc. No. 197-42].)  Shortly after the call, Buysse received a check for $360,700 and no other documentation.  (Buysse Cashier's Check, Ex. 15.11 to Jansen Decl. [Doc. No. 194-1].)

### 2.    Steven and Pamela Cheney

Steve Cheney, owner of Cheney Carpet and Vrooman Carpet, was one of Berg's biggest customers, buying between $200,000 and $400,000 worth of carpet in 2008 and 2009.  (S. Cheney Dep. at 43-44, Ex. 81 to Jansen Decl. [Doc. No. 197-30].)  Berg invited Cheney to a seminar at Trevor Cook's headquarters where Cheney learned about Cook's investment opportunities.  (Id. at 14.)  After the seminar, Cheney and his friend Larry Hopfenspirger met privately with Cook.  During that meeting, Cook promised a guaranteed return rate of 12% in his currency entities.  (Id. at 54.)  Cheney, who considers himself an "experienced investor" decided to borrow $1,000,000 to invest in the Cook Entities.  (Id. at 37, 51, 119; Cheney Oxford Application Form, Ex. 83 to Jansen

Decl. [Doc. No. 194-2].)

Additionally, Steven Cheney asked his wife Pamela to invest in the Cook Entities. Pamela Cheney testified that, after her husband attended the seminar at the Van Dusen Mansion, he reportedly described the investment opportunity as "very impressive."   (P. Cheney Dep. at 10-11, Ex. 10 to Magnuson Decl. [Doc. No. 203].)  Pamela Cheney proceeded to her bank, Wells Fargo, intending to cash out a CD in order to invest the funds in the Cook Entities.   (Id. at 11.)  While there, she spoke with a Wells Fargo employee who had attended the same Cook investment seminar and also was impressed, although she did not invest any money.  (Id.)  Pamela Cheney testified that the Wells Fargo representative detected no red flags and could understand why Mrs. Cheney planned to invest in the Cook Entities.  (Id.)   Additionally, Steven Cheney felt comfortable making the investment because of his relationship with Berg and Berg's relationship with Cook, testifying to his earlier belief at the time that  "[Cook] isn't going to steal from - - from Cliff's customers or friends."  (S. Cheney Dep. at 111, Ex. 81 to Jansen Decl. [Doc. No. 197-30].)

From February 2008 through March 2009, the Cheneys ultimately invested over $1,620,962 with Cook.  (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]; Berg Investors' Fourth Am. Resps. to Pet'r's Disc. Reqs. at 11, Ex. 34 to Jansen Decl. [Doc. No. 197-20].)  Of that amount, the Cheneys invested $520,000 on behalf of other family members.  (Cheney 2/13/08 Oxford Application Form, Ex. 83 to Jansen Decl. [Doc. No. 194-2]; Cheney Family Members' Oxford Application Forms, Exs. 89-92 to Jansen Decl.

[Doc. No. 194-2].)

All of the Cheneys signed a client agreement with Oxford Global Advisors. The agreement required a written request 30 days prior to any party terminating the account. Before the cash-out in June 2009, the Cheneys and their family members received monthly payments varying from $500-10,0000 per person, totaling $241,000. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]; Berg Investors' Fourth Am. Resps. to Pet'r's Disc. Reqs. at 12, Ex. 34 to Jansen Decl. [Doc. No. 197-20].) The Cheneys did not receive tax forms reflecting these distributions. (S. Cheney Dep. at 154, Ex. 81 to Jansen Decl. [Doc. No. 197-30].) Starting in January 2009, Steven Cheney's monthly payments were distributed from an entity called Universal Brokerage FX Management. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]; S. Cheney Wells Fargo Statement, Ex. 94 to Jansen Decl. [Doc. No. 194-2].)

Cheney testified that he attempted to invest further with Cook in late June 2009. His request was denied and Cook told him that there was "a problem with a different part of the company." (S. Cheney Dep. at 91, 162, Ex. 81 to Jansen Decl. [Doc. No. 197-30].) Steven Cheney then decided to take the money out of his account "to be safe." (Id. at 105-06). Despite the lack of a written request to close the accounts, Berg delivered three cashier's checks to Steven Cheney - one for $1,535,300 made out to Steven Cheney, another for $101,000 made out to Pamela Cheney, and another for Cheney's friend and fellow investor, Larry Hopfenspirger. (Cashier's Checks, Exs. 16.10, 16.11, 16.4 [Doc. No. 194-1]; Hopfenspirger Dep. at 125, Ex. 95 to Jansen Decl. [Doc. No. 197-32].) The

Cheneys themselves received a total of $1,636,300 on or after June 29, 2009.  No closing documents accompanied the checks, other than a piece of paper showing a breakdown in the accounts of Cheney's family members.  (S. Cheney Dep. at 100, Ex. 81 to Jansen Decl. [Doc. No. 197-30].)

### 3.    Terry and Jean Frahm

Terry Frahm learned about the investment opportunity with Cook through his wife, Jean Frahm, who was Cliff Berg's dental hygienist.  (T. Frahm Dep. at 22-23, Ex. 165 to Jansen Decl. [Doc. No. 197-43].)   The Frahms met with Cook and Berg on at least two occasions.  (J. Frahm Dep. at 21, Ex. 166 to Jansen Decl. [Doc. No. 197-44].)  During the meetings, the Frahms were told to expect a 12% return rate, with very little risk.   (T. Frahm Dep. at 43, 50-52, Ex. 165 to Jansen Decl. [Doc. No. 197-43].)

Between July 2, 2007 and January 21, 2009, Terry Frahm invested $765,162.44 in UBS, Crown Forex, and Oxford.  (Transaction List,  Ex. 36 to Jansen Decl. [Doc. No. 197-22].)  Terry Frahm testified that Cook's demonstration of trading activity, as it was displayed on an extensive bank of computer monitors at Cook's headquarters, was very believable.  (T. Frahm Dep. at 31, 83, Ex. 165 to Jansen Decl. [Doc. No. 197-43].)

As to their investments in Crown Forex, Terry Frahm signed a document which provides "to request a withdrawal, fill-in the related form and fax it or email it to us." (Frahm Crown Forex Doc. at 5, Ex. 174 to Jansen Decl. [Doc. No. 194-3].)  Additionally, Terry Frahm signed agreements providing for a "contingent deferred sales charge" or "redemption fee" if the money was withdrawn prior to four years after the account was

opened.  (T. Frahm UBS Subscription Form, Ex. 173 to Jansen Decl. [Doc. No. 194-3]; T.

Frahm Oxford Mgmt. Agreement, Ex. 167 to Jansen Decl. [Doc. No. 194-3].)

Terry Frahm testified that in late April 2009, he was concerned about the tax

consequences of his investments with Cook, so he spoke with Cook about cashing out.

(T. Frahm Dep. at 100-04, Ex. 165 to Jensen Decl. [Doc. No. 197-43].)  In May 2009,

Frahm drafted a letter to Cook requesting closure of his account.  (Letter of 5/5/09 from

R. Frahm to T. Cook, Ex. 181 to Jansen Decl. [Doc. No. 197-46].)   The document

produced in this litigation was not signed nor does Terry Frahm specifically remember

mailing it, however, he believes that he signed the original and mailed it to Cook.  (Id.; T.

Frahm Dep. at 172-74, Ex. 165 to Jensen Decl. [Doc. No. 197-43].)

In late June 2009, Berg delivered to Jean Frahm two cashier's checks, one for

$123,200 and another for $793,370, for a total of $916,570.  (J. Frahm Dep. at 60-61, Ex.

166 to Jansen Decl. [Doc. No. 197-44]; Cashier's Check, Ex. 16.5 to Jansen Decl. [Doc.

No. 194-1]; Cashier's Check, Ex. 16.7 to Jansen Decl. [Doc. No. 194-1].)

### 4.      Steven and Jean Fredell

Steven and Jean Fredell have been close friends with Cliff Berg and his wife Ellen

since high school.  (S. Fredell Dep. at 40, Ex. 56 to Jansen Decl. [Doc. No. 197-26].)

Trusting the Bergs and their connection with Cook, the Fredells met with Cook and

decided to invest with him.  (Id. at 199, 203; J. Fredell Dep. at 19-20, Ex. 57 to Jansen

Decl. [Doc. No. 197-27].)  The Fredells were guaranteed a 10.5-12% return rate.  (S.

Fredell Dep. at 58; 147, Ex. 56 to Jansen Decl. [Doc. No. 197-26].)  The Fredells signed

agreements with Crown Forex, Oxford and UBS requiring the Fredells to give written notice in order to terminate their accounts; some of the agreements also provided for the payment of fees for early redemption. (S. Fredell Oxford Mgmt. Agreement, Ex. 58 to Jansen Decl. [Doc. No. 194-2]; J. Fredell Oxford Mgmt. Agreement, Ex. 59 to Jansen Decl. [Doc. No. 194-2]; UBS Subscription Agreement, Ex. 64 to Jansen Decl. [Doc. No. 194-2]; Oxford Subscription Form, Ex. 66 to Jansen Decl. [Doc. No. 194-2]; S. Fredell Crown Forex Agreement, Ex. 67 to Jansen Decl. [Doc. No. 194-2]; J. Fredell Crown Forex Agreement, Ex. 68 to Jansen Decl. [Doc. No. 194-2]; S. Fredell Crown Forex Doc., Ex. 69 to Jansen Decl. [Doc. No. 194-2]; J. Fredell Crown Forex Authorization, Ex. 70 to Jansen Decl. [Doc. No. 194-2].)

Steven Fredell also had "handshake deals" with Berg and Cook, entrusting them "for any reason, you know, large or small, [to] get me out of it." (S. Fredell Dep. at 72-73, Ex. 56 to Jansen Decl. [Doc. No. 197-26].) While the Fredells never requested that their accounts be closed, in the summer of 2009, Cliff and Ellen Berg appeared at their residence and dropped off two cashier's checks - one for $243,250 and the other for $25,700. (Cashier's Check, Ex. 15.6 to Jansen Decl. [Doc. No. 194-1]; Cashier's Check, Ex. 15.7 to Jansen Decl. [Doc. No. 194-1]; S. Fredell Dep. at 80, Ex. 56 to Jansen Decl. [Doc. No. 197-26].) When questioned about the situation, Berg stated that he cashed out the Fredells "per [their] agreement." (S. Fredell Dep. at 75, Ex. 56 to Jansen Decl. [Doc. No. 197-26].) Berg indicated that the SEC was checking on Bo Beckman's side of the business. (Id.) Steve Fredell testified that the two cashier's checks reflected amounts that

the Fredells believed to be in their accounts at the time, and that it did not appear that any fees were taken out.  (Id. at 81.)

Steve Fredell asked if there would be any chance of reinvesting with the Cook Entities in the future.  Berg responded that Cook was planning to set up an investment opportunity with Charles Schwab, although "you probably won't be able to get quite the interest you got before, but it will be fairly good . . . ."  (Id. at 75.)

### 5.    Michael and Jennifer Heise

Michael and Jennifer Heise are in the carpet industry and have known Cliff Berg for over twenty years.  (J. Heise Dep. at 18-19, Ex. 40 to Jansen Decl. [Doc. No. 197-25]; M. Heise Dep. at 12; 24, Ex. 39 to Jansen Decl. [Doc. No. 197-24].)

Michael Heise describes himself as an experienced investor, having experience with stocks, bonds, CDs and real estate.  (M. Heise Dep. at 14-15, Ex. 39 to Jansen Decl. [Doc. No. 197-24].)  Michael Heise was aware that Cliff Berg was Trevor Cook's father-in-law.  (Id. at 26.)  After experiencing losses due to turmoil in the financial markets, Heise became interested in Cook's investment opportunities.  (Id. at 60.)  Michael Heise attended a presentation about Cook's Currency Entities at the Van Dusen Mansion, where Bo Beckman and Cook discussed a return rate of 10 percent.  (Id. at 40.)   Heise, who knew Cook investors John Dzik and Steve Cheney, was aware that they had already invested in Cook's program.  (Id. at 41.)   Because Heise considered Cheney to be a wise investor, Cheney's participation in Cook's investment program reassured Heise that Cheney had performed due diligence prior to investing.  (Id. at 42.)   Approximately one

or two months after the presentation at the mansion, Heise invested in Cook's program. (Id. at 49.)  Heise understood that he could request the return of his investment at any time by simply phoning Berg and indicating that he wanted to cash out.  (Id. at 50-51.)

Between May 2008 and June 2009, the Heises invested a total of $752,133.80 with the Cook companies.  (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) Michael Heise signed agreements that required either party terminating the agreement to give advance notice in writing.  (M. Heise Oxford Mgmt. Agreement, Ex. 41 to Jansen Decl. [Doc. No. 194-2]; M. Heise Oxford Application Form, Ex. 42 to Jansen Decl. [Doc. No. 194-2]; M. Heise Oxford Agreement, Ex. 43 to Jansen Decl. [Doc. No. 194-2]; M. Heise Crown Forex Agreement, Ex. 45 to Jansen Decl. [Doc. No. 194-2]; M. Heise Crown Forex Doc., Ex. 46 to Jansen Decl. [Doc. No. 194-2].)  Additionally, the Heises were subject to a "contingent deferred sales charge" or "redemption fee" on account closings occurring within four years of the date of their investment. (M. Heise Oxford Mgmt. Agreement, Ex. 41 to Jansen Decl. [Doc. No. 194-2]; M. Heise Oxford Subscription Form, Ex. 44 to Jansen Decl. [Doc. No. 194-2].)  Their investments were also subject to a termination fee, calculated on one-half of one percent of the asset value of the amount transferred.  (Entrust Fee Schedule, Ex. 50 to Jansen Decl. [Doc. No. 194-2].)

Michael Heise directed Berg to monitor and liquidate their accounts "if anything did go backwards or whatever."  (M. Heise Dep. at 76; 263, Ex. 39 to Jansen Decl. [Doc. No. 197-24].)   Heise indicated that Berg was to be on the lookout for problems including

"theft, cheating, stealing, bad markets, bad decisions." (Id. at 266.) Heise testified that he would say the same to "the guys at Morgan Stanley," i.e., to "watch out for my investment." (Id. at 264.)

Heise identified a single discrepancy when the interest rate on his statement "didn't add up to the 10 percent he had in mind." (Id. at 122). He contacted Cliff Berg, who said that he would get everything "squared away" with Cook employee Ryan Moeller. (Id. at 122-23.) Heise assumed that the issue "got fixed," because he never noted any other discrepancies. (Id. at 123.) While Heise testified that he did not remember whether the interest rate subsequently ceased to appear on his statements, he believed that he checked to ensure that the rate was in the 10% range and was satisfied that it was. (Id. at 128.)

The Heises never requested that their accounts be closed, nor did they complete any paperwork or receive paperwork terminating the accounts. (Id. at 71, 188.) Berg hand-delivered two cashier's checks totaling $795,911.53 to the Heises' daughter at their carpet store in late June 2009. (Id..at 76-77, 81, 93.) The Heises were not charged the account termination fees set forth in the contract with Entrust. (Id. at 85-86; Entrust Fee Schedule, Ex. 50 to Jansen Decl. [Doc. No. 194-2];.) The Heises believed that they were able to get their money out so quickly because of their relationship with Berg. (J. Heise Dep. at 85-86, Ex. 40 to Jansen Decl. [Doc. No. 197-25].)

### 6. James McIntosh

James McIntosh and Berg had known each other through the carpet business since 1979. (McIntosh Dep. at 33-35, Ex. 150 to Jansen Decl. [Doc. No. 197-40].) Around

2008, McIntosh was unhappy with his investments. (Id. at 77-78.) Berg told McIntosh about the successful returns on his investments in his son-in-law's entities. (Id. at 38, 41.) Berg arranged a meeting between McIntosh and Cook, at which Cook assured McIntosh of no risk to any principal investment made with Cook. (Id. at 98; 196.)

Relying on Berg's relationship with Cook, McIntosh decided to invest, stating: "You wouldn't think that a family member was going to go ahead and put you in a scheme that was so risky or whatever that you were going to lose your money." (Id. at 61.) McIntosh rolled over $250,000 of qualified IRA money into Cook's scheme in August 2008 through a self-directed account with Entrust. (Id. at 56, 130.) According to the agreement with Entrust, McIntosh crossed out the power of attorney section and identified himself as the only person with the authority to command transactions in that account. (Entrust Doc. at 7, Ex. 155 to Jansen Decl. [Doc. No. 194-3].)

For a period of time in 2008-2009, McIntosh received eleven monthly payments of $2,188 for purported interest that was building in his Entrust account. (Id. at 1-2; see also Entrust Account Statement, Ex. 156 to Jansen Decl. [Doc. No. 194-3]; Checks from Entrust, Ex. 157 to Jansen Decl. [Doc. No. 197-41].) In late June 2009, McIntosh heard from Berg about an investigation involving Cook's partner, Bo Beckman. (McIntosh Dep. at 163, Ex. 150 to Jansen Decl. [Doc. No. 197-40].) Berg recommended that McIntosh withdraw his investment. (Id.) McIntosh withdrew all of his money without completing withdrawal paperwork, providing written notice, or directing Entrust to send him the funds. (Id. at 118, 166-67, 186.) A few days later, McIntosh received a cashier's

check from Crown Forex, not Entrust, for $250,000.  (Id. at 118, 166, 186, 170.)   After McIntosh withdrew his money from Entrust, he nevertheless received interest payments for a two-month period.  (Id. at 186; Entrust Account Statement, Ex. 156 to Jansen Decl. [Doc. No. 194-3]; Redacted Docs., Ex. 157 to Jansen Decl. [Doc. No. 197-41].)

### 7.    Walter Defiel

Walter Defiel knew Clifford Berg through the carpet business.  (Defiel Dep. at 19-20, Ex. 99 to Jansen Decl. [Doc. No. 197-33].)  Defiel managed a company owned by Steven Cheney and was also a co-worker and friend of John Dzik.  (Id. at 11-12, 17, 21, 23.)  Defiel learned of the opportunity to invest in the Cook Currency Entities through Dzik and Berg.  (Id. at 20.)   Defiel was an inexperienced investor and considered both Dzik and Cheney to be sophisticated investors.   He testified that he found it in his best interest to mirror the investment decisions of more sophisticated investors.  (Id.)   Defiel knew that Cheney and Dzik had invested with Cook, therefore he was interested in investing with Cook as well.  (Id. at 25.)

Defiel met with Berg, who told him that his rate of return ranged between 10.25-12%.  (Id. at 29-30.)  Defiel was earning a dismal 1% rate of return on his investments at the time.  (Id. at 57.)   Berg told Defiel that "there wasn't any risk" in Cook's currency trade and that he could get his money out at any time.  (Id. at 31-32.)  Defiel knew that Berg was Cook's father-in-law.  (Id. at 41, 47, 55.)

Before investing, Defiel spoke with his financial advisor at Ameriprise Financial Services.  (Id. at 36-37, 64-66.)   Defiel testified his advisor told him "not to do it"

because he "didn't think it was legit." (Id. at 35.)  Defiel testified that his advisor further

stated, "If it sounds too good, looks too good, something like it just isn't going to

happen." (Id.)  Defiel's advisor, Craig Le Vesseur, however, contends that he did not

characterize the currency trading investment as illegal or illegitimate, and simply

encouraged Defiel to investigate the investment carefully.  (Decl. of Craig Le Vesseur ¶¶

3-4 [Doc. No. 211].)  Defiel invested $80,000 in Oxford on November 23, 2007.  (Id. at

35, 54-57; Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].)

Defiel signed an agreement with Oxford requiring the party terminating the

account to provide 30 days' written notice to the other party, as well as an agreement that

imposed a fee if the account was closed within four years of the opening date.  (Oxford

Agreement, Ex. 101 to Jansen Decl. [Doc. No. 194-2]; Oxford Subscription Form, Ex.

102 to Jansen Decl. [Doc. No. 194-2].)  However, Defiel's understanding from Berg was

that if he wanted his money out at any time, he could receive it without incurring a

penalty.  (Defiel Dep. at 39-40, Ex. 99 to Jansen Decl. [Doc. No. 197-33].)   In May 2009,

Defiel considered the possibility of withdrawing his investment in the Cook Entities  and

transferring it to his other investments with Ameriprise, because he was retiring and had

worked with Craig Le Vesseur, his Ameriprise financial advisor, for many years.  (Id. at

33-35.)  When he phoned the Cook Entities  to inquire about transferring his investment,

he felt that he wasn't given direct answers and was told to phone back the following day,

although he did not do so.  (Id. at 34-39.)

On or about June 29, 2009, John Dzik gave Defiel a cashier's check, from Berg,

for around $94,950.  (<u>Id.</u> at 59.)   Defiel testified that he understood this to be the return

of his $80,000 investment, plus interest.  (<u>Id.</u>)  Dzik also gave Defiel a check for George

and Karen Morisset, friends of Defiel, asking Defiel to give the check to the Morissets.

(<u>Id.</u> at 48, 59, 74.)   Defiel had not requested that his account be closed and did not

complete any paperwork to do so.  (<u>Id.</u> at 60-61.)

### 8.    Reynold Sundstrom

Reynold Sundstrom is the owner of a carpet business and became acquainted with

Cliff Berg over twenty years ago, when Berg was a carpet sales representative.

(Sundstrom Dep. at 18, 31, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)   During that

period, Berg frequently visited Sundstrom's business and they saw each other at carpet

conventions.  (<u>Id.</u> at 32-33.)

At some point in 2008, Berg gave Sundstrom a brochure promoting Cook's

investment program and Berg told Sundstrom about the 10-12% return rates.  (<u>Id.</u> at 37,

39.)  At that time, Sundstrom was unaware of any investment opportunities offering a

return greater than 6%.  (<u>Id.</u> at 78.)  Sundstrom thought that the 10% return rate on Cook

investments "sounded awful good," and he asked his attorney to review the opportunity to

see "if there's something wrong with it."  (<u>Id.</u> at 38-39).  Sundstrom heard nothing in

response from his attorney, so he assumed that there was no problem with investing in

Cook's program. (<u>Id.</u> at 39.)

Berg invited Sundstrom and his wife to the Van Dusen Mansion, where they met

with Cook.  (<u>Id.</u> at 68-69.)  Cook discussed how his currency trading program operated,

pointing to approximately 15 flashing computer monitors. (<u>Id.</u> at 70-71.) Consistent with what Berg had previously told Sundstrom, Cook told Sundstrom that his investments would yield a 12% interest rate. (<u>Id.</u> at 75-76.) Sundstrom testified that he did not fully understand how the investment program worked, but he trusted Cliff Berg. (<u>Id.</u> at 72.) Berg assured Sundstrom that if he ever wanted to take out his money, he should simply ask Berg. (<u>Id.</u>) Sundstrom decided to invest with Cook, sending a $60,000 check to Oxford in January 2008, and a $15,000 check to Crown Forex in January of 2009. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) With respect to both Oxford and Crown Forex, Sundstrom signed agreements requiring the party terminating the account to give written notice. (Sundstrom Oxford Mgmt. Agreement, Ex. 113 to Jansen Decl. [Doc. No. 194-2]; Sundstrom Oxford Agreement, Ex. 115 to Jansen Decl. [Doc. No. 194-2]; Sundstrom Crown Forex Doc., Ex. 117 to Jansen Decl. [Doc. No. 194-2].) Additionally, Sundstrom signed an agreement that provided for a contingent deferred sales charge if the account was closed within four years of the opening date (Sundstrom Oxford Subscription Form, Ex. 116 to Jansen Decl. [Doc. No. 194-2]), although on another document, language regarding fees is crossed out, with the handwritten notation, "waived." (Sundstrom Oxford Mgmt. Agreement, Ex. 113 to Jansen Decl. [Doc. No. 194-2].) Sundstrom could not recall any discussions regarding the waiver of fees. (Sundstrom Dep. at 164, Ex. 112 to Jansen Decl. [Doc. No. 197-36]

In late June 2009, Berg phoned Sundstrom telling him that there was a "glitch," or an investigation, and that Sundstrom's money would be returned to him. (Sundstrom

Dep. at 111, Ex 112 [Doc. No. 197-36].) Berg indicated that the money could later be reinvested with Cook in a Charles Schwab account. (Id. at 111-12.) Sundstrom never received any notice or paperwork signifying that his account was being terminated. (Id. at 151). Sundstrom received a cashiers check for $85,450 from the Crown Forex LLC account at Associated Bank. (Id. at 135, 184.) Sundstrom did not pay any fees for terminating the account in less than four years of its opening. (Id. at 145).

### 9. Steven Kautzman

Steven Kautzman also knew Berg for many years through his work in the carpet industry. (Kautzman Dep. at 23-25, Ex. 120 to Jansen Decl. [Doc. No. 197-37].) At an industry trade show, Berg informed Kautzman of an investment opportunity with Cook. (Id.) Kautzman testified that he told Berg that the funds he had to invest were "all I got" and "it's got to be safe." (Id. at 33.) Kautzman also testified that Berg had a lot of respect in the carpet industry. (Id. at 33-34.) Kautzman was not concerned that Berg was not an investment advisor, but "went by the familial relationship [Berg] had" with his son-in-law. (Id. at 35.) Kautzman met with Cook's employee, Ryan Moeller, to discuss investment in the Cook companies. (Id. at 37.)

In March 2009, Kautzman decided to invest $116,469.30 in the Cook Entities. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) Kautzman signed agreements with both Oxford and Crown Forex requiring the party terminating the account to give written notice. (Kautzman Oxford Mgmt. Agreement, Ex. 121 to Jansen Decl. [Doc. No. 194-3]; Kautzman Crown Forex Doc.; Ex. 122 to Jansen Decl. [Doc. No.

194-3].)  Additionally, Kautzman's Oxford agreement provided for a contingent deferred sales charge if the account was closed within four years of the opening date.  (Kautzman Oxford Mgmt. Agreement, Ex. 121 to Jansen Decl. [Doc. No. 194-3].)

Kautzman told Berg several times that he wanted him to watch over his investment: "you need to protect me here and make darn sure that . . . we got to get out of this thing if there's ever anything going on;"  "you got to take care of me;" "watch out for my butt;" and "I need to get my money clear if something happened."  (Kautzman Dep. at 19, 55-56, 160, Ex. 120 to Jansen Decl. [Doc. No. 197-37].)

In late 2009, Berg informed Kautzman that he was mailing Kautzman a check, returning his investment in the Cook Entities.  (Id. at 52.)  Kautzman received a check for $119,550 in late June 2009.  (Id. at 63; Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].)  Kautzman never asked for the cash to be withdrawn, and did not provide or receive notice about the account closure.  (Id. at 95-96.)   Kautzman was not charged any transaction fees for the withdrawal.  (Id. at 53.)  Kautzman testified that Berg "performed" by sending the funds.  (Id. at 161.)

### 10.    George and Karen Morisset

The Morissets learned about the investment opportunities with Cook from their close friend, Walter Defiel.  (G. Morisset Dep. at 16, 21, Ex. 104 to Jansen Decl. [Doc. No. 197-34]; Defiel Dep. at 47-48, Ex. 99 to Jansen Decl. [Doc. No. 197-33].)  Ryan Moeller, a Cook employee, discussed with the Morissets an expected return rate of 10% and the ability to withdraw their money at any time.  (G. Morisset Dep. at 43-45, Ex. 104

to Jansen Decl. [Doc. No. 197-34]; K. Morisset Dep. at 18-19, Ex. 105 to Jansen Decl. [Doc. No. 197-35].)

Although Karen Morisset was a loan officer and had not seen any rate of return higher than 6% in her thirteen years in the banking industry (K. Morisset Dep. at 18, Ex. 105 to Jansen Decl. [Doc. No. 197-35]), the Morissets sent $55,734.26 of qualified IRA money to the Cook Entities through custodian Entrust. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) George Morisset, aware that Steven Cheney invested with Cook, testified that he thought it prudent to follow Cheney's investment decisions, because he considered Cheney to be a more experienced investor. (G. Morisset Dep. at 22-23, Ex. 104 to Jansen Decl. [Doc. No. 197-34].)

The Morissets signed agreements with Crown Forex requiring the party terminating the account to give written notice. (G. Morisset Crown Forex Agreement, Ex. 106 to Jansen Decl. [Doc. No. 194-2]; K. Morisset Crown Forex Agreement, Ex. 107 to Jansen Decl. [Doc. No. 194-2].)

Although they had not requested that their Cook accounts be liquidated, Walter Defiel contacted the Morissets in late June 2009 and stated that he had checks for the Morissets, which he, in turn, had received from John Dzik. (G. Morisset Dep. at 68-70, Ex. 104 to Jansen Decl. [Doc. No. 197-34].) Defiel indicated that Dzik had received the checks from Cliff Berg, who the Morissets had never met. (Id. at 73-75.) Defiel gave the Morissets two checks: $22,000 made out to George Morisset, and $39,050 made out to Karen Morisset – a total of $5,315.74 more than they had invested. (Id. at 69, 72; G.

Morisset Cashier's Check, Ex. 15.2 to Jansen Decl. [Doc. No. 194-1]; K. Morisset Cashier's Check, Ex. 15.3 to Jansen Decl. [Doc. No. 194-1]; Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) Mrs. Morisset found the manner in which they received their checks unusual: "You know, it was – I guess I just assumed something was going on." (K. Morisset Dep. at 40-41, Ex. 105 to Jansen Decl. [Doc. No. 197-34].) She phoned the Cook headquarters the next day to ask some questions, but was unable to reach anyone. (Id. at 40-41.)

### 11.    Michael and Cynthia Hillesheim

Michael and Cynthia Hillesheim knew Cliff Berg through Mrs. Hillesheim's work in the carpet industry. (C. Hillesheim Dep. at 14, Ex. 128 to Jansen Decl. [Doc. No. 197-39].) Looking for a safe investment, the Hillesheims had heard about Cook's investment opportunity through Berg. (M. Hillesheim Dep. at 20-21, Ex. 127 to Jansen Decl. [Doc. No. 197-38].) Berg arranged a meeting between the Hillesheims and Cook at which Cook guaranteed the Hillesheims a 10% return on their investment with no risk to their principal. (Id. at 21-23.)

The Hillesheims decided to invest $220,079 in Cook's program. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].) They signed agreements with Crown Forex, Oxford, and UBS that required the party terminating the account to give written notice. (M. Hillesheim Oxford Mgmt. Agreement, Ex. 129 to Jansen Decl. [Doc. No. 194-3]; M. Hillesheim Oxford Mgmt. Agreement, Ex. 130 to Jansen Decl. [Doc. No. 194-3]; C. Hillesheim Oxford Mgmt. Agreement, Ex. 131 to Jansen Decl. [Doc. No. 194-3]; M.

Hillesheim UBS Agreement, Ex. 133 to Jansen Decl. [Doc. No. 194-3]; C. Hillesheim UBS Agreement, Ex. 134 to Jansen Decl. [Doc. No. 194-3]; M. Hillesheim Crown Forex Doc., Ex. 138 to Jansen Decl. [Doc. No. 194-3]; C. Hillesheim Crown Forex Doc. Ex. 139 to Jansen Decl. [Doc. No. 194-3]; Crown Forex Doc., Ex. 140 to Jansen Decl. [Doc. No. 194-3].)   The Crown Forex agreement specified that "to request a withdrawal, fill in the related form and fax it or email it to us."  (Crown Forex Doc. at 7, Ex. 140 to Jansen Decl. [Doc. No. 194-3].)   The Hillesheims wanted Berg to get their money out if Berg had concerns about their investment.  (M. Hillesheim Dep. at 83, 193, Ex. 127 to Jansen Decl. [Doc. No. 197-38]; C. Hillesheim Dep. at 31, 71-72, Ex. 128 to Jansen Decl. [Doc. No. 197-39].)

Although the Hillesheims did not request a withdrawal, in June 2009, Berg called Cynthia Hillesheim and told her that he had cashed out the Hillesheims' investment.  (C. Hillesheim Dep. at 61, Ex. 128 to Jansen Decl. [Doc. No. 197-39].)  The Hillesheims received $256,150, which was $36,070.82 more than they had invested with Cook. (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]; M. Hillesheim Cashier's Check, Ex. 15.8 to Jansen Decl. [Doc. No. 194-1]; C. Hillesheim Cashier's Check, Ex. 15.9 to Jansen Decl. [Doc. No. 194-1]; M. Hillesheim Wells Fargo Cashier's Check, Ex. 16.6 to Jansen Decl. [Doc. No. 194-1]; M. Hillesheim Wells Fargo Cashier's Check, Ex. 16.8 to Jansen Decl. [Doc. No. 194-1]; C. Hillesheim Wells Fargo Cashier's Check, Ex. 16.9 to Jansen Decl. [Doc. No. 194-1].)

### 12.    Larry Hopfenspirger

Larry Hopfenspirger, a long-time friend of Steven Cheney, attended a currency investment presentation at the Van Dusen Mansion, along with Cheney. (Hopfenspirger Dep. at 32-33, Ex. 95 to Jansen Decl. [Doc. No. 197-32].) After learning about the program, Hopfenspirger likened it to a bank account, but with twenty-four times the return per month. (Id. at 38).

Hopfenspirger, a full-time investor in real estate and equities with seven employees (id. at 17-20, 22), invested $600,500 through Oxford. (Berg Investors' Transaction, Ex. 36 to Jansen. Decl. [Doc. No. 197-22].) Hopfenspirger did not perform any due diligence on Cook or his currency strategy. (Hopfenspirger Dept. at 214, Ex. 95 to Jansen Decl. [Doc. No. 197-32].) Hopfenspirger made handwritten changes to the Oxford subscription form, such as "12% interest is guaranteed for one year." (Oxford Agreement, Ex. 98 to Jansen Decl. [Doc. No. 194-2].) Hopfenspirger signed another agreement with Oxford stating that written notice was required for terminating the account. (Oxford Agreement, Ex. 97 to Jansen Decl. [Doc. No. 194-2].)

In addition to regularly receiving monthly interest payments ranging from $2,000 to $6,000 (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22]), in October and December 2008, Hopfenspirger twice withdrew $200,000. (Id.)

As Cook's Ponzi scheme was unraveling, Steven Cheney approached Hopfenspirger and asked him if he wanted him to withdraw his money. (Hopfenspirger Dep. at 129, 132, Ex. 95 to Jansen Decl. [Doc. No. 197-32].) While Hopfenspirger indicated that he wanted to do so, he did not sign any papers, or make a written request

for withdrawal.  (Id. at 129, 137.)   He conceded that Cheney had no authority to ask for his money, but at the time, he "didn't think about it.  (Id. at 130-33.)  Berg delivered to Steve Cheney a $202,000 check for Hopfenspirger, which Cheney then mailed to Hopfenspirger.  (Id. at 125.)  The check was from UBS, despite no apparent agreement between UBS and Hopfenspirger.  (Transaction List, Ex. 36 to Jansen Decl. [Doc. No. 197-22].)  No one from the Cook Entities called to verify that Hopfenspirger wanted to withdraw the funds.  (Hopfenspirger Dep. at 130, Ex. 95 to Jansen Decl. [Doc. No. 197-32].)  Hopfenspirger received no paperwork reflecting that his account was closed.  (Id. at 137.)

### 13.    Dot Anderson

Dot Anderson learned of an investment opportunity with the Cook Entities through her grandson, Grant Grzybowski, who worked as a salesman for Cook. (Anderson Dep. at 11, Ex. 182 to Jansen Decl. [Doc. No. 197-47].)  Grzybowski gave his 89-year-old grandmother a brochure and told her that she would earn a 10.5% rate of return, with no mention of risk.  (Id. at 13, 15.)  In mid-June 2009, Anderson mailed a check for $102,000 to a company called Basel International ("Basel").  (Id. at 38-40, 44; Check Payable to Basel International, Ex. 183 to Jansen Decl. [Doc. No. 194-3].)   The Basel entity was a shell company created by Cook and his partner Kiley and was not organized or incorporated under the laws of any state.  (Hlavacek Decl. ¶ 15, Ex. 2 to Jansen Decl. [Doc. No. 197].)  Grzybowski testified that at the time his grandmother invested in the Cook Entities, Cook had instructed him to put all new customers'

investments into Basel, while current customers' new investments were to be put in Crown Forex. (Grzybowski Dep. at 65-66, Ex. 13 to Jansen Decl. [Doc. No. 197-8].) In response to a deposition question asking why this was the case, Grzybowski testified that he was not sure of the reason, but volunteered, "Well, because there was a major fraud going on obviously." (Id. at 66.) The Basel account collected and commingled over $500,000 in funds from investors. (Hlavacek Decl. ¶ 58, Ex. 2 to Jansen Decl. [Doc. No. 197], Summary of Funds Received, Ex. 3 to Jansen Decl. [Doc. No. 197-1]; Basel Detail of Transactions, Ex. 1 to Hlavacek Decl. [Doc. No. 195-1].) On July 10, 2009, Cook transferred $350,000 from the Basel account to a bank in Cyprus. (Basel Detail of Transactions, Ex. 1 to Hlavacek Decl. [Doc. No. 195-1].) On July 13, 2009, Cook transferred $350,000 from the Oxford entity into the Basel account. (Id.)

The total amount of Anderson's investment in Basel consisted of a $100,000 investment of principal, along with a $2,000 charge for creating the account. In creating the account, Anderson's various agreements imposed a 2% entry fee, as well as a 4% redemption fee or contingent deferred sales charge, if Anderson closed the account within one year. (Grzybowski Dep. at 86-88, Ex. 13 [Doc. No. 197-8]; Anderson Oxford Mgmt. Agreement, Ex. 184 to Jansen Decl. [Doc. No. 194-3]; Basel Order Authorization, Ex. 186 to Jansen Decl. [Doc. No. 194-3]; Austrum Notes, Ex. 187 to Jansen Decl. [Doc. No. 194-3].) Anderson's Management Agreement, which was with Oxford, even though her investment was with Basel, gave either party the right to terminate the agreement with written notice. (Anderson Oxford Mgmt. Agreement, Ex. 184 to Jansen Decl. [Doc. No.

34

194-3].)

On July 8, 2009, Cook informed Grzybowski about an article in the Star Tribune that was likely to be published the following day. (Grzybowski Dep. at 108-09; 118-19, Ex. 13 to Jansen Decl. [Doc. No. 197-8].) The article concerned a lawsuit filed by a group of Cook investors from Ohio, who alleged that they were unable to withdraw their money. (Id. at 108.) Grzybowski testified that after the article was published, his phone "blew up" with calls from investors. (Id. at 111.) Dot Anderson was among those who called. (Id. at 111, 119.) On or before July 15, 2009, Anderson read the July 9, 2009 Star Tribune news article about Cook and phoned her grandson. (Anderson Dep. at 45-49, Ex. 182 to Jansen Decl. [Doc. No. 197-8].) Grzybowski testified that when Anderson phoned him, she stated, "I think you know why I'm calling . . . . I just read the article in the paper." (Grzybowski Dep. at 119, Ex. 13 to Jansen Decl. [Doc. No. 197-8].) Anderson asked her grandson for guidance on what to do. (Id. at 120-21.) Grzybowski told his grandmother that he did not know what was going on. (Id. at 120.) He testified that he told Anderson the same thing that he had been telling other investors who called, including his father – to do what she thought was right. (Id. at 121.) Grzybowski testified that he did not want family members to take a certain course of action based on his familial relationship, but told them that if they wanted to close their accounts, they could. (Id. at 183-84.) Grzybowski offered little concrete guidance to those phoning in with questions because, "I didn't know what to tell people, and I wasn't getting straight answers from Trevor on what was going on, why these people weren't getting their

money back – ."  (Id. at 184.)

After another newspaper article was printed, Anderson asked Grzybowski to get her money out.  (Anderson Dep. at 45, Ex. 182 to Jansen Decl. [Doc. No. 197-47]; Grzybowski Dep. at 121-22, Ex. 13 to Jansen Decl. [Doc. No. 197-8].)  Grzybowski testified that he told his grandmother that the withdrawal would be subject to the 4% deferred sales charge, and she approved the withdrawal.  (Grzybowski Dep. at 185, Ex. 13 to Jansen Decl. [Doc. No. 197-8].)  Grzybowski testified that he handled his grandmother's request in the same manner in which he handled any other client's request for a withdrawal.  (Id. at 186.)   He testified that his grandmother signed a withdrawal from, which he then provided to Cook (id. at 113, 123 and 139), although Anderson does not recall completing any paperwork.  (Anderson Dep. at 52, Ex. 182 to Jansen Decl. [Doc. No. 197-47].)   Grzybowski testified that Cook knew that Dot Anderson was Grzybowski's grandmother.  (Grzybowski Dep. at 139, Ex. 13 to Jansen Decl. [Doc. No. 197-8].)

On July 15, 2009, Cook directed his assistant, Julia Smith Gilsrud, the authorized signatory on the Basel bank account, to send two wires to Dot Anderson – the first for $101,000, the second for $1,000.  (Emails from T. Cook to J. Smith, Ex. 192 to Jansen Decl.  [Doc. No. 194-3].)   A total of $102,000 was wired to Anderson's bank account – the same amount that she had invested.  (Wire Transaction Logs, Ex. 188 to Jansen Decl. [Doc. No. 194-3].)

Grzybowski testified that, to his knowledge, his grandmother was the only Cook

investor who successfully withdrew her money after the publication of the July 9, 2009

Star Tribune article.  (Grzybowski Dep. at 144, Ex. 13 to Jansen Decl. [Doc. No. 194-3].)

Cook followed up with Grzybowski to confirm that Dot Anderson had received her

money.  (Id. at 142.)   Anderson herself went to the bank to confirm that the money had

been wired.  (Anderson Dep. at 51-52, Ex. 182 to Jansen Decl.  [Doc. No. 197-47].)

Grzybowski testified that he was not aware in the summer of 2009 that the Cook Entities

were a Ponzi scheme. (Grzybowski Dep. at 217, Ex. 13 to Jansen Decl. [Doc. No. 197-

8].)  Grzybowski did not suspect a problem with his employer until November 2009.

(Id.)

Cook testified that he intended to run the Basel entity as a legitimate entity (Cook

Dep. at 122, Ex. 8 to Jansen Decl. [Doc. No. 197-5]), and that the return of Anderson's

funds by Basel was not done in furtherance of the Ponzi scheme.  (Id. at 126.)   Cook also

testified to his belief that other investors in Basel asked for their money back and did not

receive it.  (Id. at 136.)

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court

must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  Enter. Bank v. Magna

Bank, 92 F.3d 743, 747 (8th Cir. 1996).  However, "summary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). On a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party. Davison v. City of Minneapolis, 490 F.3d 648, 651 (8th Cir. 2007).

### B. The Parties' Summary Judgment Motions

Petitioner moves for summary judgment, arguing that there are no genuine issues of material fact in dispute with respect to his claims for fraudulent transfer and unjust enrichment. Specifically, as to the fraudulent transfer claim, Petitioner argues that the transfers at issue were made with actual intent to defraud the Receivership Entities' creditors. Furthermore, Petitioner argues, Respondents have failed, as a matter of law, to establish an affirmative good faith defense. As to Petitioner's unjust enrichment claim, Petitioner contends that Respondents all "knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit

its retention." (Pet'r's Mem. Supp. Mot. for Summ. J. at 89 [Doc. No. 193] (quoting S.E.C. v. Brown, 643 F. Supp.2d 1077, 1083) (D. Minn. 2009) (internal citation omitted)). Petitioner also seeks summary judgment as to various additional defenses asserted by Respondents, including: (1) failure to state a claim; (2) estoppel, waiver, and laches; (3) failure to mitigate/election of remedies; (4) accord and satisfaction; (5) doctrine of payment; (6) res judicata, collateral estoppel, merger, and bar; (7) unclean hands, in pari delicto, preceding breach of contract; and (8) damages by third parties.

In response to Petitioner's Motion, and in support of their own respective motions, Respondents argue that Petitioner has not demonstrated actual intent to defraud under a "Ponzi scheme presumption" of actual intent, nor has Petitioner alternatively demonstrated sufficient "badges of fraud" to support a finding of actual intent. (See, e.g., Investor Resp'ts' Opp'n Mem. at 23-29 [Doc. No. 225]; Anderson's Mem. Supp. Mot. Summ. J. at 11-18 [Doc. No. 189].) Even if the Court were to find that Petitioner has made a showing of actual intent, Respondents invoke the affirmative defense of good faith, arguing that the circumstances of this case would not have put a reasonable person on notice of the debtor's fraudulent purpose, and a diligent inquiry would not have discovered that fraudulent purpose.

The Investor Respondents also contend that to the extent that Petitioner's claims rely upon an agency relationship between themselves and Cliff Berg, Petitioner has failed

to plead agency, and, in any event, no agency relationship existed.

### 1.    Fraudulent Transfer

Minnesota has adopted the Uniform Fraudulent Transfer Act.  Minn. Stat. § 513.43, *et seq*.  Under the Minnesota Uniform Fraudulent Transfer Act ("MUFTA"), a party may assert a cause of action in one of two ways:  "A transfer made . . .by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation" either "with actual intent to hinder, delay, or defraud any creditor of the debtor," or "without receiving a reasonably equivalent value in exchange for the transfer or obligation."[10]  Minn. Stat. § 513.44(a)(1)-(2).  Here, Petitioner pleads a fraudulent transfer claim involving actual intent.   (See Petition ¶ 40 [Doc. No. 1].)

A Ponzi scheme is "insolvent from its inception."  Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006) (citing Cunningham, 265 U.S. at 7-8).  As this Court has observed,

> "One of the key characteristics of a Ponzi scheme is that not all of the assets
> are immediately consumed by the perpetrator of the scheme . . . .
> Moreover, the classic Ponzi scheme is most often a fraudulent investment
> scheme in which the earlier investor's returns are generated by the influx of

---

[10]  Along with many other federal district courts, this Court has found that fraudulent transfer claims brought under federal bankruptcy statutes, in particular, 11 U.S.C. § 548, provide a useful analogy to Uniform Fraudulent Transfer Act claims.  See Brown, 643 F. Supp.2d at 1082, n.3.  Similar to language in the MUFTA statute, § 548 states that a "trustee may avoid any transfer ... of an interest of the debtor in property ... if the debtor voluntarily or involuntarily ... made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became ... indebted." 11 U.S.C. § 548(a)(1)(A).  As MUFTA and § 548 are similar, the Court relies on decisions arising under § 548 as well in addressing Petitioner's fraudulent transfer claim.

> fresh capital from unsuspecting new investors, rather than through
> legitimate investment activity."

United States v. Hays, No. 09-CR-91(1) (DWF), 2011 WL 4583822, *2 (D. Minn. Sept.

30, 2011) (citing Cunningham, 265 U.S. at 1).   Courts have therefore applied a "Ponzi

scheme presumption," in finding that sufficient evidence of a Ponzi scheme establishes

that transfers made pursuant to the scheme were made with actual intent to hinder, delay,

or defraud.[11]   Wagner v. Pruett (In re Vaughan Co., Realtors), __ B.R. __, No. 11-10-

10759 SA, 2012 WL 3166721, *6 -7  (Bankr. D. N.M. Aug. 2, 2012) (collecting cases,

see, e.g., Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi

schemes, transfers made in furtherance of the scheme are presumed to have been made

with the intent to defraud for purposes of recovering the payments under §§ 548(a) and

544(b).") (citations omitted); In re AFI Holding, Inc., 525 F.3d 700, 704 (9th Cir. 2008))

(" 'the mere existence of a Ponzi scheme' is sufficient to establish actual intent under

548(a)(1) or a state's equivalent to that section.") (quoting Hayes v. Palm Seedlings

Partners (In re Agric. Research and Tech. Group, Inc.), 916 F.2d 528, 535 (9th Cir.

1990)); S.E.C. v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit,

---

[11]   The Ponzi scheme presumption is an exception to the ordinary fraudulent
transfer analysis, recognizing the unique, entirely fraudulent nature of Ponzi schemes.
As direct evidence of fraudulent intent is rarely established in ordinary fraudulent transfer
cases, i.e., non-Ponzi scheme cases, courts otherwise look to whether circumstantial
evidence in the form of "badges of fraud" establishes fraudulent intent.   Brown v. Third
Nat'l Bank (In re Sherman), 67 F.3d 1348, 1353-54 (8th Cir. 1995).  If the Ponzi scheme
presumption applies to the transfers at issue, a court need not examine the badges of
fraud.

proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); Ivey v. Swofford (In re Whitley), No. 10-10426, 2012 WL 170135, *4 (Bankr. M.D.N.C. Jan.19, 2012) (finding that the Ponzi scheme presumption applicable to 11 U.S.C. § 548 should likewise be applied to the North Carolina fraudulent transfer statute).

Thus, pursuant to the Ponzi scheme presumption, courts presume that any "'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors.'" McHale v. Boulder Capital LLC (In re The 1031 Tax Group, LLC), 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (quoting Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 8 (S.D.N.Y. 2007) (additional internal citations omitted). Moreover, the criminal conviction of the Ponzi scheme operator may be considered determinative of the existence of the scheme and of its fraudulent intent, with some courts finding such a conviction to have preclusive effect on this point:

> Numerous courts have found that a criminal conviction for operating a Ponzi scheme establishes the operator's fraudulent intent and precludes relitigation of this issue. Floyd v. Dunson (In re Rodriguez), 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997); and Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 440 (Bankr. N.D. Ill. 1995), citing, In re Raiford, 695 F.2d 521, 523 (11th Cir. 1983) and Nathan v. Tenna Corp., 560 F.2d 761, 763-64 (7th Cir. 1977).

Terry v. June, 432 F. Supp.2d 635, 640 (W.D. Va. 2006).

Even where the plaintiff has alleged the existence of a broad Ponzi scheme, "the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in

order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]." Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Group, LLC), ("Bayou I"), 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007). In Merrill v. Abbott (In re Indep. Clearing House), 77 B.R. 843, 860 (D. Utah 1987), the court found that, "if at the time the debtors make transfers to earlier undertakers they had the actual intent to hinder, delay or defraud later undertakers, transfers to earlier undertakers may be fraudulent within the meaning of section 548(a)(1) [of the Bankruptcy Code]." Elaborating on the rationale for this ruling, another court has stated:

> Finding the debtor took acts in furtherance of a Ponzi scheme, however, does not automatically entitle the trustee to rely upon the Ponzi scheme presumption. To establish the debtor's fraudulent intent with regard to the specific transfers at issue in this case, the trustee must show that each transfer was made in furtherance of the Ponzi scheme. The reason for this is clear: the Court can only infer intent to defraud future purchasers when the trustee has shown the transfers at issue somehow perpetuated the debtor's Ponzi scheme. Transfers made by the debtor unrelated to the Ponzi scheme do not warrant this inference.

Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Financial Services, LLC), No. 6:08-bk-969-KSJ, 2011 WL 2580763, *5 (Bankr. M.D. Fla. June 24, 2011) (emphasis in original); see also In re Manhattan Inv. Fund, 397 B.R. at 11 (noting that "courts must be sure that the transfers sought to be avoided are related to the scheme"); Cuthill v. Greenmark (In re World Vision Ent., Inc.), 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002) (observing that "[s]imply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance"); Daly v. Deptula (In re Carrozzella & Richardson), 286 B.R. 480, 490-91 (D. Conn. 2002)

(affirming the bankruptcy court's ruling that the proper focus was on the particular transfer itself, and not on the overall business practices of the debtor).

It is indisputable that Cook operated a Ponzi scheme, as evidenced by his guilty plea and conviction and the criminal convictions of his colleagues.  (Sentencing Judgment of 8/25/10, <u>United States v. Cook</u>, 10-CR-75 (JMR) [Doc. No. 18]); Plea Agreement, <u>United States v. Pettengill</u>, 11-CR-192 (MJD) [Doc. No. 6]; Jury Verdicts, <u>United States v. Beckman, et al.</u>, 11-CR-228 (MJD/JJK) [Doc. Nos. 303, 305, 307].)   The scheme involved the various entities in which the Respondents invested their funds.  (<u>See</u>, <u>e.g.</u>, Decl. of Scott J. Hlavacek, Ex. 2 to Jansen Decl. [Doc. No. 197].)   While Respondents do not contest that Cook operated a Ponzi scheme, they argue that the Ponzi scheme presumption is inapplicable here because the transfers in question were not made in furtherance of the Ponzi scheme, but rather, they were made <u>after</u> the Cook Currency Entities stopped taking money from new investors.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 61-63 [Doc. No. 202]; Anderson's Mem. Supp. Mot. for Summ. J. at 15 [Doc. No. 189].)   For that proposition, the Respondents cite to the deposition of Ryan Moeller (<u>id.</u>), who worked as a sales associate for the Cook Currency Trading Entities for "roughly three or four months."  (Moeller Dep. at 30, Ex. 24 to Magnuson Decl. [Doc. No. 203-24].)  Moeller testified to his belief that the currency trading entities stopped taking money from new investors around the time of the SEC investigation – he did not believe that any new money was taken in after the investigation began.  (<u>Id.</u> at 29.) However, to the contrary, Cook testified that his currency trading entities did accept more

investments after the SEC investigation, including around the time that the Investor

Respondents' checks were issued, and possibly for a week thereafter.  (Cook Dep. at 87-

88, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)

Moreover, Berg informed certain investors that Cook planned to move his

currency trading business to another brokerage firm such as Charles Schwab.  (See, e.g.,

S. Fredell Dep. at 75, Ex. 56 to Jansen Decl. [Doc. No. 197-26]; Sundstrom Dep. at 111-

12, Ex 112  [Doc. No. 197-36].)   Steven Cheney testified that he phoned Cook in late

June 2008, seeking to create two new accounts for family members, but Cook told him to

hold off due to the investigation.  (S. Cheney Dep. at 91-95, Ex. 81 to Jansen Decl. [Doc.

No. 197-30].)   Cook told him that he was moving his currency trading business to

another brokerage company and that he should wait until it was in place before opening

the new accounts. (Id. at 91-94.)  Cook testified that the Cook Entities were in the process

of setting up hedge funds called GFI Currency Funds that would be offered through

Charles Schwab and that they were "looking for, also, different banks that we could

perform the currency trades through."  (Cook Dep. at 86, Ex. 8 to Jansen Decl. [Doc. No.

197-5].)

### a.  Investor Respondents

The Ponzi scheme presumption applies to the Investor Respondents, regardless of

whether they characterize their investments as loans.  The Investor Respondents argue

that the particular transfers at issue represented a legitimate repayment of their loans at a

time when the scheme had wound down and was no longer infused with the funds of new

45

victims.  See In re Carrozzella & Richardson, 286 B.R. at 484-91 (holding that contractual interest payments were not constructively fraudulent because they represented reasonably equivalent value for use of money).  However, the Investor Respondents' assert no credible argument that these transfers should be construed as "unrelated to the Ponzi scheme."

Responding to the argument that an investment in a Ponzi scheme was a loan, one court has observed that "[t]he case law about Ponzi schemes does not support a distinction between investments and loans," describing it as a "distinction without a difference."  Finn v. Peoples Bank of Wis., No. 11-CV-322-WMC, 2012 U.S. Dist. LEXIS 130863, at * 41 (W.D. Wis. Aug. 22, 2012).

> A Ponzi scheme is, by definition, a non-sustaining proposition:
>
> A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.

Terry, 432 F. Supp.2d at 640 (quoting In re Indep. Clearing House, 77 B.R. at 860).  This rationale may also partly explain why courts have applied the Ponzi scheme presumption to transfers that might appear theoretically "legitimate."  For example, in Stoebner v. Ritchie Capital Mgmt. (In re: Polaroid Corp.), 472 B.R. 22, 40-42 (Bankr. D. Minn. 2012), the Bankruptcy Court in this District applied the Ponzi scheme presumption to transfers made by a related entity outside the main operation of the scheme.  The court

rejected the arguments of the defendant/related entity that the presumption could not be applied because it was a legitimate business – not a Ponzi scheme that would inevitably fail.  Id.  Rather, the court found that "the automatic inference of fraudulent intent is made when the person in common control effects the transfer by the entity extrinsic to the Ponzi scheme, but in order to further the scheme as it has been maintained through the central entity."  (Id. at 41) (emphasis in original).  The court thus applied the Ponzi scheme presumption to transfers that were made by an outside entity, pointing to the motivation of Tom Petters, the Ponzi scheme operator, as proof of the intentional transfer, based on his "manifest wish . . . to prolong the imposture of the Ponzi scheme (thus 'furthering' it), by effecting the transfer by the controlled, related company."  Id.  Similarly, the court in Scholes v. Lehmann applied the presumption to a transfer that appeared legitimate:

> It is no answer that some or for that matter all of Phillips's profit may have come from "legitimate" trades made by the corporations.  They were not legitimate.  The money used for the trades came from investors gulled by fraudulent representations.  Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money.  That would be true as between him and [the Ponzi scheme operator or his] corporations.  It is not true as between him and either the creditors of or the other investors in the corporations.  He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud.  All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.

56 F.3d 750, 757-58 (7th Cir. 1995).

The fact that Cook's Ponzi scheme was unraveling at the time of the Investor

Respondents' pay-out does not mean that their transfers were legitimate, or that there was no Ponzi scheme. As the Ponzi scheme operator, Cook was motivated to sustain the fiction of his currency trading business as long as possible in order to perpetuate the fraud. At Cook's direction, following Berg's request to cash out his friends, Cook "prolonged the imposture of the Ponzi scheme" by directing that checks be issued to the Investor Respondents.

Ryan Moeller, Cook's employee, testified that the Cook Currency Entities ceased taking new investors' funds 'around the time of the SEC investigation' (Moeller Dep. at 30, Ex. 24 to Magnuson Decl. [Doc. No. 203-24]) – an investigation that included, to Cook's knowledge, the currency entities. (Cook Dep. at 78, Ex. 8 to Jansen Decl. [Doc. No. 197-5].) Moeller's testimony is not precise as to the date and Cook's testimony on the subject is similarly inexact. Cook testified that his currency trading entities continued to take investments after the SEC investigation, however, including up to the time that the Investor Respondents' cashier's checks were issued on June 29, and possibly for a week thereafter. (Id. at 87-88.) Moreover, Berg told certain investors that Cook's currency trading business would be relocated to Charles Schwab (see, e.g., S. Fredell Dep. at 75, Ex. 56 to Jansen Decl. [Doc. No. 197-26]; Sundstrom Dep. at 111-12, Ex 112 [Doc. No. 197-36]), and Cook himself told Steven Cheney to hold off on adding new investment accounts until he had moved his currency trading business to a different brokerage company. (S. Cheney Dep. at 91-95, Ex. 81 to Jansen Decl. [Doc. No. 197-30].) Cook testified that the Cook Entities were in the process of developing hedge funds

called GFI Currency Funds that would be offered through Charles Schwab and that they were also looking for different banks with which to perform the currency trades. (Cook Dep. at 86, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)

Thus, the evidence shows that Cook's Ponzi scheme was operational, and he intended to simply relocate the currency trading business, when the funds were transferred. Petitioner has alleged and demonstrated that Cook and the Receivership Entities transferred funds with actual intent to hinder, delay, or defraud their creditors, knowing that the remaining funds were insufficient to pay creditors of and/or investors in the scheme. (Pet. ¶¶ 40-41 [Doc. No. 1].) The cashier's checks issued to Berg's investors were related to the Ponzi scheme, unlike payments that Cook may have made at the time for legitimate expenditures or services unrelated to the Ponzi scheme, such as for electricity or water.

The payments to Respondents were made with the knowledge that not all investors would receive something back because of the unraveling of Cook's scheme. Rather, the transfers were made preferentially, knowing that many other creditors would not be paid in full and the "returns" – the amounts in excess of the average investment – were _not_ investment returns, but other investors' money. As the architect of this scheme, Cook possessed full knowledge that the transfers made to Respondents were the fruits of the scheme. No reasonable juror could find otherwise. But for their connections to Cliff Berg, and Berg's connections to Cook, in the case of the Investor Respondents, and her connection to her grandson, Grant Grzybowski, in the case of Dot Anderson, Respondents

would have found themselves in the same situation as nearly 700 other investors in Cook's Ponzi scheme.

Under these facts, no reasonable juror could find that Cook had no actual intent to forestall and hinder his creditors in making the preferential transfers to the Investor Respondents. The funds distributed to Respondents were the fruits of a Ponzi scheme and only a federal investigation into Cook's illegal activities eventually brought the scheme to a halt. News coverage of that investigation and of the Phillipses' lawsuit also likely led future investors to think twice about investing in Cook's entities, so it is hardly surprising that eventually, the Cook Entities no longer received funds from new investors. Cook operated a Ponzi scheme and the Investor Respondents' transfers were clearly made pursuant to that scheme.

For all of these reasons, the Court finds that there is no genuine issue of material fact in dispute that the preferential transfers to the Investor Respondents were fraudulent transfers made with actual intent to hinder, delay, or defraud Cook's creditors.

### b. Dot Anderson

As with the Investor Respondents, Dot Anderson argues that her investment pay-out was not received in furtherance of the Ponzi scheme, because she received it at a time when the Ponzi scheme was not taking in funds from new investors. Moreover, she argues that the entity in which she had invested, Basel, was solvent at the time of her pay-out. Anderson points to Cook's testimony, in which he stated that he intended to run the Basel entity as a legitimate business. (Cook Dep. at 122, Ex. 8 to Jansen Decl. [Doc. No. 197-

5].)  She further cites to testimony from one of the Receiver's investigators, Richard

Ostrum, in which he testified that the transfer to Anderson did not constitute "an attempt to

evade creditors."  (Anderson's Mem. Supp. Mot. for Summ. J. at 15 [Doc. No. 189].)

(citing Ostrum Dep. at 130, Ex. 5 to Huhta Decl. [Doc. No. 190-5].)   Anderson therefore

argues that her receipt of funds in July 2009 did not involve actual intent to "hinder, delay,

or defraud" Cook's creditors.  Anderson raises additional arguments as well, contending

that Petitioner's allegations that she received a preferential transfer do not form the basis

of a fraudulent transfer claim and that the Receiver/Petitioner is not a "creditor,"

authorized to sue.

The facts, however, demonstrate that the Basel group was very much a part of

Cook's Ponzi scheme, whatever Cook's self-proclaimed intent may have been to run Basel

as a "legitimate" entity.   (Cook Dep. at 122, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)   As

noted above, courts have applied the Ponzi scheme presumption to theoretically legitimate

businesses or entities.  See In re: Polaroid Corp., 472 B.R. at 40-42; Scholes, 56 F.3d at

757-58.  The Basel entity was a shell organization created by Cook and Kiley and was not

formally organized or incorporated in any state.  (Hlavacek Decl. ¶ 15, Ex. 2 to Jansen

Decl. [Doc. No. 197].)   Cook testified that the Basel funds "never got started" and that

"[Anderson's] money was just sitting there and it wasn't being managed or it wasn't being

traded for anything."  (Cook Dep. at 122-23, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)

The Basel account funds were not used as advertised in Cook's foreign currency program,

as they were not traded.  (Basel Detail of Transactions, Ex. I to Hlavacek Decl. [Doc. No.

195-1].)

During its approximately two-month active life span in June and July 2009, the Basel account contained net deposits of over $900,000, including at least $500,000 of commingled investor funds and a wire transfer of $350,000 from Oxford made on June 13, 2009. (Basel Detail of Transactions, Ex. I to Hlavacek Decl. [Doc. No. 195-1].) When asked if Anderson's money was commingled with that of other investors, Cook testified, "Yeah. All the money was commingled." (Cook Dep. at 123, Ex. 8 to Jansen Decl. [Doc. No. 197-5].) An SEC accountant-investigator, Scott Hlavacek, prepared an exhibit summarizing the Basel entity's deposits and withdrawals. (Basel Detail of Transactions, Ex. I to Hlavacek Decl. [Doc. No. 195-1].) His transaction log reveals that the June 16, 2009 deposit of $102,000 from Dot Anderson was one of the first two investor deposits in the account. (Id.) Basel funds were used for non-investment items such as attorney's fees, marketing costs, and a $350,000 wire transfer to Cyprus. (Id.)

Although Anderson argues that Basel was solvent at the time she received the transfer, a Ponzi scheme, as noted, is "insolvent from its inception." Cunningham, 265 U.S. at 1, 7-8. Anderson argues that at the time of the transfer to her, Basel's bank account contained $302,682.45. (Associated Bank Account Statement for Basel, Ex. 17 to Huhta Decl. [Doc. No. 191-8].) However, the Basel transaction log reflects that at the time of the transfer, the Basel account had a cash balance of $404,725, but liabilities to

investors of at least $429,625.[12]  (Basel Detail of Transactions, Ex. I to Hlavacek Decl. [Doc. No. 195-1].)

Anderson cites to deposition testimony from the Receiver's investigators in support of her argument that her transfer was not an attempt to evade creditors.  (Anderson's Mem. Supp. Mot. for Summ. J. at 15-16 [Doc. No. 189].)  However, both investigators stated that their role was to locate, secure and inventory assets.  [Austrum Dep. at 12, Ex. 189 to Jansen Decl. [Doc. No. 197-48]; Ostrom Dep. at 13-19, Ex. 23 to Decl. of Peter M. Kohlhepp Ex. 23 [Doc. No. 209-17].)    Their role was not to opine on this ultimate legal question.   The Court finds that the objective evidence in the record demonstrates that the Ponzi scheme presumption applies to the transfer of funds to Dot Anderson.

While Anderson also argues that Cook himself played no role in closing her account, the evidence demonstrates otherwise.  While Cook was not a signatory on the Basel account, he directed Julia Smith Gilsrud, his assistant, to effectuate the account closing.  (Emails from T. Cook to J. Smith, Ex. 192 to Jansen Decl. [Doc. No. 194-3].)

---

[12] In granting the Receiver's motion for an order allowing summary proceedings in the SEC action, which directly gave rise to the instant action, Chief Judge Davis issued certain findings regarding Cook's Ponzi scheme.  Specifically, he found that all assets transferred from or by any Receivership entity named in the lawsuit (which named Basel Group, LLC, along with Crown Forex, Oxford, Cliff and Ellen Berg, and others), were transferred pursuant to the Ponzi scheme.  (Order of 7/20/10 at 1, SEC case, 09-CV-3333 MJD/JJK, Ex. 33 to Jansen Decl. [Doc. No. 197-19].)   Chief Judge Davis further found that all assets transferred from or by Cook, from at least August 2005 through November 2009, were transferred pursuant to the Ponzi scheme.  (Id.)   The Court is aware that Respondents were not parties to that proceeding and therefore does not give that ruling res judicata or preclusive effect.  However, the Court does take notice of Chief Judge Davis' Order.

Cook followed up later with Grant Grzybowski to ensure that Anderson received the transfer. (Grzybowski Dep. at 142, Ex. 13 [Doc. No. 197-8].) The Court is satisfied that the evidence shows that Basel was part of the Ponzi scheme and that the transfer to Anderson occurred in furtherance of that scheme. The Court therefore finds no genuine issues of material fact in dispute with respect to Petitioner's fraudulent transfer claim as it relates to Dot Anderson.

Anderson raises arguments pertaining to standing and other defenses, including good faith, which the Court addresses, *infra,* in its discussion of Respondents' additional arguments.

## 2. Good Faith Defense to Fraudulent Transfer

Under the MUFTA, "[a] transfer or obligation is not voidable under section 513.44(a)(1) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Minn. Stat. § 513.48. As an affirmative defense, Respondents bear the burden of establishing good faith. Warfield, 436 F.3d at 560.

The question of good faith consists of two parts: (1) whether the transferee was on inquiry notice of the transferor's fraud or insolvency; and, if so, (2) whether the transferee conducted a diligent investigation. See In re Manhattan Inv. Fund, 397 B.R. at 23. Good faith is determined on a case-by-case basis by evaluating what the transferee "knew or should have known" under an objective standard. In re Sherman, 67 F.3d at 1355. A court evaluates objective good faith from the standpoint of a reasonable person. In re

World Vision Entm't, Inc., 275 B.R. at 659.  Courts have applied this reasonableness standard from the perspective of a person with a background similar to that of the transferee, incorporating the "standards, norms, practices, sophistication, and experience generally possessed by participants in the transferee's industry or class."  See, e.g., Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC) ("Bayou IV"), 439 B.R. 284, 313 (S.D.N.Y. 2010); Jobin v. McKay (In re M & L Bus. Mach. Co, Inc.), 84 F.3d 1330, 1338-39 (10th Cir. 1996).  Given the case-by-case nature of the analysis, it is not surprising that "[a] finding of good faith is primarily a factual determination. . . ."  Meeks v. Red River Entm't of Shreveport (In re Murray F. Armstrong), 285 F.3d 1092, 1096 (8th Cir. 2002).  "Although questions of good faith may generally be difficult to establish on summary judgment, it is important to bear in mind that appellants carry the burden of demonstrating their objective good faith at trial."  In re Agric. Research & Tech. Group, 916 F.2d at 536.

The "knew or should have known" standard requires the court to inquire into whether the recipient had "inquiry notice" of the debtor's insolvency or of the fraudulent purpose of the transaction and whether the transaction carried the earmarks of an arms-length bargain.  Id.; Meeks v. Greenville Casino Partners L.P. (In re Armstrong), 217 B.R. 569, 575 (Bankr. E.D. Ark. 1998).  The court in Bayou IV extended the analysis of inquiry notice to signs of possible fraud or insolvency.  439 B.R. at 312.  As between the standard applied by the Eighth Circuit and the broader analysis applied by the Southern District of New York in Bayou IV decision, this Court will apply the standard previously articulated

by the Eighth Circuit in <u>In re Sherman</u>. Thus, a transferee is on inquiry notice when he has sufficient facts to question whether the transfer was made for a fraudulent purpose or whether the transferor was insolvent. <u>In re Sherman</u>, 67 F.3d at 1355.

Courts look to whether any facts, or "red flags," exist, sufficient to cause a reasonable person to inquire further. <u>See</u> <u>id.</u>, 67 F.3d at 1356; <u>In re Manhattan Inv. Fund</u>, 397 B.R. at 23. For example, the <u>Sherman</u> court concluded that the transferee's knowledge of the debtors' substantial debts, of their delinquent mortgage payments, of a bank's plan to file foreclosure proceedings against them, and of a pending lawsuit placed the transferee on inquiry notice that the transfer of the debtors' property was not made in good faith under § 548(c). <u>In re Sherman</u>, 67 F.3d at 1355-56. The presence of such signs requires the transferee to diligently investigate. <u>Bayou IV</u>, 439 B.R. at 312; <u>Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial)</u>, 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000); <u>In re Agric. Research & Tech. Group, Inc.</u>, 916 F.2d at 539. A failure to inquire "in the face of unusual circumstances also is sufficient to preclude a good faith defense." <u>In re Model Imperial</u>, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000). Thus willful ignorance does not support a finding of good faith. <u>Id.</u>; <u>see also</u> <u>In re M & L Bus. Mach.</u>, 84 F.3d at 1335–36.

If, however, a diligent investigation would have proven futile, a transferee may yet establish good faith: "If the transferee can meet its burden of demonstrating that a diligent investigation would not have led to discovery of the fraud, it may prevail on this prong of the good faith affirmative defense." <u>Bayou IV</u>, 439 B.R. at 317. In a subsequent decision

in that case, denying the transferees' post-trial motions for judgment as a matter of law, the Bayou IV court appears to have expanded a transferee's good faith defense options, allowing a transferee to prove up either diligent inquiry or futility.  Bayou Superfund, LLC v. D. Canale Beverages, Inc. (In re Bayou Group, LLC) ("Bayou IV"), No. 09 Civ. 02340(PGG), 2012 WL 386275, at *1 (S.D.N.Y. Feb. 6, 2012).  Using the disjunctive clause "or," the court held that once a transferee is placed on inquiry notice, "it must conduct a diligent investigation of the facts that put it on inquiry notice or demonstrate that a diligent inquiry would not have uncovered the transferor's insolvency or fraudulent purpose in making the payment."  Id. (emphasis added).

While Respondents urge the Court to apply this Bayou IV standard, the Court declines.  Case law has established that a diligent investigation is an essential requirement of a good faith defense once a transferee is on inquiry notice.  See In re Model Imperial, 250 B.R. at 798; In re Agric. Research & Tech. Group, Inc., 916 F.2d at 539.  Even the Bayou IV decision itself supports that conclusion in its actual application of the law, despite the use of the disjunctive clause.  The transferees in Bayou IV did not assert that they had conducted a diligent investigation, but instead contended that no diligent investigation would have uncovered the Bayou hedge funds' fraudulent purpose or insolvency.  Bayou IV, 2012 WL 386275, at *4.  The court concluded that ample evidence supported the jury's conclusion that a diligent investigation would have led to the discovery of the fraud.  Id. at *7-8.

Petitioner argues that numerous red flags should have placed Respondents on

inquiry notice that their respective transfers were made with a fraudulent purpose. As to the Investor Respondents, Petitioner points to the relationship between Berg and the Investor Respondents, arguing that Berg functioned as their agent, and that his knowledge may be imputed to them. (Pet'r's Mem. Supp. Mot. for Summ. J. at 31 [Doc. No. 193].) Moreover, independent of Berg, Petitioner identifies various red flags with respect to the individual Investor Respondents, arguing that the facts demonstrate that they knew or should have known of the fraud. (Id. at 37.) Regarding Dot Anderson, Petitioner argues that Anderson read about the fraud, and utilized an insider, her grandson, to get her money back, demonstrating a lack of good faith. (Id. at 97.)

In response, Respondents argue that the good faith defense applies and they are entitled to summary judgment on Petitioner's fraudulent transfer claim based on this defense. In support of their argument, Respondents argue that Chief Judge Davis' January 27, 2010 ruling on attorneys' fees is determinative of this issue. They argue that, like the attorneys in the motion before Chief Judge Davis, they did not know, nor could have known of the fraudulent purpose of the transfers. In addition, Respondents argue that no diligent inquiry was necessary because any such inquiry would have been futile. Respondents contend that had they contacted the SEC with questions about the investigation, they would not have been informed of any potential problems. (See Anderson Mem. Supp. Mot. for Summ. J. at 23 [Doc. No. 189].) Rather, Respondents aver that the SEC was informing investors, as late as October 2009, that neither the SEC nor its staff had concluded that Cook's operation had been violating securities laws. (Id. at 24)

(citing SEC Enforcement Division Letter, Ex. 19 to Huhta Decl. [Doc. No. 191-10].) The Respondents contend that the SEC further conveyed that the fact of the investigation should not be construed as an indication by the Commission of any actual violation or adverse reflection upon any person, entity, or security. (Id.)

### a. Investor Respondents

As noted, with respect to the Investor Respondents, Petitioner imputes Berg's actions to them, arguing that Berg acted as their agent, and the Investor Respondents ratified his actions by accepting the cashier's checks. (Petr's Mem. Supp. Summ. J. at 37 [Doc. No. 193].) Petitioner notes that many of the Investor Respondents trusted Berg through their work in the same business and asked him to keep an eye on their investments. (See, e.g., id. at 47.)

As to Berg's knowledge and actions, Petitioner contends that the Court may draw an adverse inference from Berg's refusal to testify in this case. (Id. at 32.) Petitioner also identifies, as a red flag, Berg's knowledge of the SEC investigation during the week of June 22, 2009, which prompted him to ask Cook to cash out the accounts in question. (Id. at 34.) Petitioner further notes that Berg did so without even speaking to the Investor Respondents in advance. Moreover, the Power of Attorney documents signed by several of the Investor Respondents explicitly prohibited authorizing any agent "to withdraw or give instructions for payment of any sums payable, or delivery of any property deliverable under or in respect of transactions on my/our Account(s) to any person other than me/us." (See, e.g., M. Heise Power of Attorney, Ex. 47 to Jansen Decl. [Doc. No. 194-2]; J. Fredell

Power of Attorney, Ex. 70 to Jansen Decl. [Doc. No. 194-2]; R. Sundstrom Power of Attorney, Ex. 119 to Jansen Decl. [Doc. No. 194-3]; Kautzman Power of Attorney, Ex. 123 to Jansen Decl. [Doc. No. 194-3]; Buysse Power of Attorney, Ex. 163 to Jansen Decl. [Doc. No. 194-3]; Frahm Power of Attorney, Ex. 175 to Jansen Decl. [Doc. No. 194-3].) In addition, Petitioner argues that Berg felt the need to explain his actions in cashing out the accounts to at least nine of the investors, telling them that he had closed their accounts because of an investigation or audit. (Id. at 36.)

As to the transfer of his own funds, when Berg initially deposited the cashier's checks made out to him and his wife, he told a bank manager that he was "trying to help out his son-in-law." (Id.) (citing Witness Testimony, 12/4/09 Hearing Transcript, CFTC Case, 09-CV-3332, at 37-38, 41, Ex. 10 to Jansen Decl. [Doc. No. 197-7].) All of this, Petitioner contends, would have caused a reasonable person to question whether the cashier's checks were issued for a fraudulent purpose or whether the Cook Entities were insolvent.

The Investor Respondents, however, disavow that Berg functioned as their agent. (Investor Resp'ts' Opp'n Mem. at 47-55 [Doc. No. 225].) Each of the Investor Respondents, or in the case of married couple Respondents, a single representative of the couple, have filed declarations attesting that, as a factual matter, Berg was not their agent, stating:

> I never requested that Clifford Berg act as my agent, and Clifford Berg never agreed to act as my agent. I did not believe that Clifford Berg would act as an independent agent on my behalf with regard to my loans to the Cook

Currency Entities, and Clifford Berg never led me to believe that he would act as an independent agent on my behalf. I never believed I had the ability to control Berg's actions as they related to my accounts other than I expected him to convey any instructions I gave him to the appropriate parties who had the knowledge or authority necessary to perform whatever action I needed taken, nor did Berg ever tell me that he was assuming any duty to act on my behalf in any capacity.

(Decl. of David Buysse ¶ 1 [Doc. No. 212]; Decl. of Steven Cheney ¶1 [Doc. No. 213]; Decl. of Cynthia Hillesheim ¶ 1 [Doc. No. 214]; Decl. of Walter Defiel ¶ 1 [Doc. No. 215]; Decl. of Terry Frahm ¶ 1 [Doc. No. 216]; Decl. of Steven Fredell ¶ 1 [Doc. No. 217]; Decl. of Michael Heise ¶ 1 [Doc. No. 218]; Decl. of Larry Hopfenspirger ¶ 1 [Doc. No. 219]; Decl. of Steven Kautzman ¶ 1 [Doc. No. 220]; Decl. of James McIntosh ¶ 1 [Doc. No. 221]; Decl. of Michael Hillesheim ¶ 1 [Doc. No. 222]; Decl. of George Morisset ¶ 1 [Doc. No. 223]; Decl. of Reynold Sundstrom ¶ 1 [Doc. No. 224].) As a legal matter, the Investor Respondents further contend that Petitioner cannot establish the elements of agency. (Investor Resp'ts' Opp'n Mem. at 48-55 [Doc. No. 225].) They contend that they did not have a legal right to control Berg, Berg had no fiduciary duty to them, Berg's actions were gratuitous favors, and they never ratified Berg's actions. (Id.) Moreover, from a procedural standpoint, the Investor Respondents argue that Petitioner's claims of agency were not pled and should therefore not be permitted.

Independent of Berg and the agency issue, Petitioner argues that numerous red flags put each of the Investor Respondents on inquiry notice of the insolvency of the scheme or the fraudulent nature of the transfers. In support of this argument, Petitioner identifies the following as red flags, discussed in greater detail with respect to the Investor Respondents

61

individually: (1) most Respondents received an unsolicited distribution of funds; (2) Berg had promised to monitor the Investor Respondents' accounts; (3) the Investor Respondents knew that Cook was Berg's son-in-law; (4) the Investor Respondents knew that Berg was not an investment advisor; (5) Respondents did not receive written account closure documents; (6) Respondents were not charged a fee for the closure of their accounts; (7) some Respondents knew of the existence of an investigation or audit; (8) Respondents received money directly from the Cook Entities, instead of third-party custodians; (9) some Respondents continued to receive statements after the accounts were closed; (10) some Respondents noted discrepancies in account statements and documents; and (11) Respondents were promised an unusually high rate of return. (Pet'r's Mem. Supp. Mot. for Summ. J. at 36-38 [Doc. No. 193].)

As to the red flags common to most all Respondents, Respondents argue that the professed rate of return in the Cook foreign currency program of between 10-12% is not indicative of fraud or insolvency. The Investor Respondents cite to various cases in which similar interest rates were considered commercially reasonable. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 73 [Doc. No. 202] (citing Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital), No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) (finding that an interest of up to 12% annually was commercially reasonable); In re Carrozzella & Richardson, 270 B.R. at 97 (holding that an annual interest rate of 15% was commercially reasonable)).

Respondents also argue that any discrepancies in account opening and closing

documents are not relevant to the good faith analysis because such documents do not point to either the fraudulent purpose of the transfers or to the insolvency of the Cook Entities. (Id. at 74.)  They note that Cook himself was unaware of any concerns expressed by investors about inconsistencies in account opening statements.  (Cook Dep. at 81, Ex. 8 to Jansen Decl. [Doc. No. 197-5].)   As to the unsolicited nature of the return of funds to several of the Investor Respondents, they contend that investors Cheney, Frahm, Hopfenspirger and McIntosh requested the return of their investments, therefore the 'unsolicited distribution' red flag is inapplicable to them.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 75 [Doc. No. 202] (citing S. Cheney Dep. at 93, Ex. 81 to Jansen Decl. [Doc. No. 197-30]; T. Frahm Dep. at 106, Ex. 165 to Jansen Decl. [Doc. No. 197-43]; Hopfenspirger Dep. at 124-25, Ex. 95 to Jansen Decl. [Doc. No. 197-32]; McIntosh Dep. at 163, Ex. 150 to Jansen Decl. [Doc. No. 197-40].)

In addition, the Investor Respondents argue that the fact that they did not receive documentation of their account closures was not a red flag.  Rather, they argue, several of the Respondents had been told that Cook planned to move his currency trading program to Charles Schwab, and speculated that the waiver of closing fees represented an attempt to retain their business.  Respondent Reynold Sundstrom believed that the fees were waived because of Cliff Berg's influence.  (Sundstrom Dep. at 116, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)

The Investor Respondents also argue that information regarding Cliff Berg himself did not constitute a red flag.   The fact that Berg was Cook's father-in-law and that Berg

was not an investment advisor, they contend, could not possibly suggest to any reasonable investor that the transfers were for fraudulent purposes or that the Cook Entities were insolvent.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 77 [Doc. No. 202].) Rather, the Investor Respondents argue, the fact of the Cook-Berg relationship reassured many of them that Cook was <u>not</u> engaging in fraudulent activity.  (<u>Id.</u>) (citing S. Cheney Dep. at 111, Ex. 81 to Jansen Decl. [Doc. No. 197-30].)

The Investor Respondents further argue that they cannot be held to be on inquiry notice by virtue of the fact that their funds were returned, or because of the form in which the funds were returned.  To the contrary, the Investor Respondents argue, the cashier's checks constituted evidence that the Cook Currency Entities were solvent and not operating fraudulently, as they were purchased with cash.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 79 [Doc. No. 202].)

The Investor Respondents further contend that the fact of the SEC investigation and the <u>Phillips</u> litigation were not red flags.  First, they argue that certain of the investors had no knowledge of the SEC investigation.  (<u>Id.</u>)  Second, they contend that even Cook employees were reassured that nothing was wrong.  (<u>Id.</u> at 80) (citing Moeller Dep. at 37, Ex. 24 to Magnuson Decl. [Doc. No. 203-24]; Grzybowski Dep. at 187, Ex. 27 to Magnuson Decl. [Doc. No. 203-27].)  The Investor Respondents argue that because they believed that their funds were held in segregated accounts, they would have had no reason to be concerned about an SEC investigation into Bo Beckman's trading entity.

### (1)    Michael and Jennifer Heise

Petitioner contends that the Heises were on inquiry notice, citing the fact that Michael Heise warned Berg to watch out for various problems such as "cheating," "stealing," and "bad decisions." (Pet'r's Mem. Supp. Mot. for Summ. J. at 42-43 [Doc. No. 193]) (citing M. Heise Dep. at 266, Ex. 39 to Jansen Decl. [Doc. No. 197-24].) Thus, when their account was closed without warning, Petitioner contends that the only reasonable inference to be drawn was that one of the "problems" arose, and the Cook companies might be either insolvent or illegitimate. (Pet'r's Mem. Supp. Mot. for Summ. J. at 43 [Doc. No. 193].) As to whether the return of their investments was suspicious, Heise testified, "I don't really care because I've got – my deposits are out. . . .." (M. Heise Dep. at 95-96, Ex. 39 to Jansen Decl. [Doc. No. 197-24].) Michael Heise's Power of Attorney agreement prohibited any agent from withdrawing or delivering payments on Heise's account. (M. Heise Power of Attorney, Ex. 47 to Jansen Decl. [Doc. No. 194-2].) Petitioner argues that the transferred money, which was supposed to be qualified IRA money, bypassed the third-party custodian, Entrust, without an account termination fee. (Pet'r's Mem. Supp. Mot. for Summ. J. at 43 [Doc. No. 193].) Petitioner also contends that no withdrawal paperwork was completed, no early withdrawal fees were charged, and no written notice was tendered by either party. (Id.) Petitioner argues that a relatively experienced investor like Michael Heise should have questioned an investment opportunity that offered double-digit returns, at a time when other low-risk options such as bank CDs offered 2%. (Id. at 44) (citing M. Heise Dep. at 60, Ex. 39 to Jansen Decl. [Doc. No. 197-24].) Petitioner also points to irregularities in the Heises' monthly

65

statements, including a math error and dropped interest rate, as questionable. (<u>Id.</u>)

The Heises, however, argue that the only red flag of which they could have been aware was that their money was returned to them without their written request. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 89 [Doc. No. 202].) Acknowledging that they had an agreement with Berg whereby he was to return their funds if there were problems of any kind, they maintain that they had no knowledge of either fraud or insolvency. (<u>Id.</u>) While Michael Heise was informed of the SEC investigation after receiving the bulk of his funds, he learned of the existence of the investigation prior to receiving one final check from the Cook Entities. He was told, however, that the investigation was into a related, but unconnected, entity. (<u>Id.</u>) The Heises thus argue that they had no notice of facts indicating fraud or insolvency. (<u>Id.</u>)

### (2)     Steven and Jenene Fredell

Petitioner contends that the Fredells were also on inquiry notice, as they understood that Berg or Cook would "get [Steve Fredell's] butt out of there" if anything "big or small" went wrong, "no questions asked." (Pet'r's Mem. Supp. Mot. for Summ. J. at 47 [Doc. No. 193] (citing S. Fredell Dep. at 72-73, Ex. 56 to Jansen Decl. [Doc. No. 194-3].) Again, Petitioner argues that when Berg delivered the unsolicited cashier's checks, the only reasonable inference was that something 'was wrong.' (<u>Id.</u>) Jenene Fredell's Power of Attorney agreement prohibited any agent from withdrawing or delivering payments on her account. (J. Fredell Power of Attorney, Ex. 70 to Jansen Decl. [Doc. No. 194-2].) Petitioner also cites to the 10.5-12% rate of return, with "no risk

of loss," as unrealistic, causing a reasonable person to question the legitimacy or solvency of the operation. (Id. at 48.) As with the Heises, the Fredells' investment consisted of qualified IRA funds and their transfer did not go through third-party custodians. (Id.) Nor were the Fredells charged early redemption fees. (Id.) Petitioner contends that while the Fredells were aware of this, they did not inquire further. (Id.) When Berg delivered the checks, he told the Fredells that "the SEC was in doing some checking" – a fact which Petitioner argues conferred actual knowledge of the SEC investigation at Cook's offices on the Fredells. (Id.)

The Fredells contend that Berg informed them that Cook was moving his currency trading business to Charles Schwab. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 87 [Doc. No. 202].) They were interested in investing with Cook again. (Id.) They argue that this demonstrates a lack of awareness of any red flags. (Id.) As relatively inexperienced investors, the Fredells maintain that they had no information to put them on notice of fraud or insolvency. (Id. at 88.) They contend that they were not told of the SEC investigation until after they had received their money. (Id.)

### (3)    Steven and Pamela Cheney

As to the Cheneys, Petitioner argues they were on inquiry notice. (Pet'r's Mem. Supp. Mot. for Summ. J. at 54 [Doc. No. 193].) Petitioners notes that Cook told Cheney about problems with the Cook companies, prompting Cheney to tell Cook that he wanted to withdraw his investments "to be safe." (Id.) He told his friend Larry Hopfenspirger to do the same. (S. Cheney Dep. at 91-93, Ex. 81 to Jansen Decl. [Doc. No. 197-30].) Each

of the Cheney family members had signed contracts requiring advance written notice of account closures, but no such notice was provided. (Pet'r's Mem. Supp. Mot. for Summ. J. at 54 [Doc. No. 193].) Furthermore, while Steven Cheney's extended family members purportedly had their own accounts, Berg delivered one check to Steven Cheney, representing the funds in all of the accounts of his extended family members. (Id. at 54-55.) Petitioner points to the fact that Steve Cheney's cashier's check, and his wife's, were drawn on a UBS account, although they had no dealings with that entity. (Id.) No receipts accompanied the distributions. (Id.)

The Cheneys argue that while Steven Cheney was a relatively experienced investor, he had no expertise in currency trading. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 83 [Doc. No. 202].) In addition, he contends that he affirmatively requested the return of his funds. (Id.) While Trevor Cook informed Cheney of a "problem" with a business in Cook's "group," Cheney testified that Cook reassured him that the Cook Currency Entities were "rock solid." (S. Cheney Dept. at 92, Ex. 81 to Jansen Decl. [Doc. No. 197-30].) In addition, Cook told Cheney that he was moving his currency trading business to Charles Schwab. (Id. at 91-95.) Cheney also notes that he was planning to reinvest with Cook when he reopened his currency trading business there. (Id. at 158.) Cheney contends that he invested with Cook, in part, because of his trust in Berg. (Id. at 111.) That trust, he contends, was based on the assumption that Cook would not embezzle from his father-in-law. (Id.) He testified that Cook agreed to waive any fees associated with his investment, because Cook told Cheney that he made an additional 3% on top of the approximately

12% return on the investments.  (Id. at 122-23.)   Therefore, the Cheneys argue that because of this understanding, it was not a red flag when they were not charged fees associated with their transfers.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 84 [Doc. No. 202].)   Accordingly, the Cheneys argue that they were not on notice of fraud or insolvency and received the transferred funds in good faith.  (Id.)

### (4)    Larry Hopfenspirger

Petitioner contends that Larry Hopfenspirger, a full-time investor, was also on inquiry notice.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 60 [Doc. No. 193].) Hopfenspirger characterized the rate of return, combined with the ability to withdraw his investment, as "Monopoly, free parking."  (Hopfenspirger Dep. at 84, Ex. 95 to Jansen Decl. [Doc. No. 197-32].)  When Hopfenspirger's friend Steven Cheney told him in June 2009 that he was closing all of his family's accounts with Cook, Hopfenspirger wanted his money out as well.  (Id. at 124-25.)  Petitioner argues that Cheney's closure of Hopfenspirger's account – despite the lack of any relationship with the account and no authority over it – placed Hopfenspirger on inquiry notice that the Cook Entities were either fraudulent or insolvent.  (Pet'r's Mem. Supp Mot. for Summ. J. at 60 [Doc. No. 193].)

Hopfenspirger contends that he had previously made two oral requests for payment of funds and had received checks from Ryan Moeller and Trevor Cook.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 90 [Doc. No. 202].)  He contends that in June 2009, his friend Steven Cheney informed him of his conversation with Trevor Cook regarding the

investigation into Bo Beckman's business – the Cook Currency Entities were not involved, according to Cheney. (<u>Id.</u> at 90-91.) Cheney also told him of plans for Cook to move his currency trading business to Charles Schwab. (<u>Id.</u>) Hopfenspirger contends that because he had to repay the balance on two term notes, he requested that Cheney withdraw the rest of his funds. (<u>Id.</u> at 91.) Maintaining the assumption that the Cook Currency Entities would transmit his check through Cheney, Hopfenspirger was not surprised when he received his check in that manner. (<u>Id.</u>) Hopfenspirger contends that he could recall no contractual obligations that would have prohibited Cheney from relaying Hopfenspirger's request for repayment and tendering the check to him. (<u>Id.</u>) Hopfenspirger maintains that he received the first two transfers of $200,000 in good faith, and that he did not request the return of the remaining $200,000 in light of his knowledge of the investigation, but because he wanted to repay a line of credit that was due. (<u>Id.</u>) Therefore, Hopfenspirger argues that he was not on notice of fraud or insolvency. (<u>Id.</u>)

### (5) Walter Defiel

With regard to Walter Defiel, Petitioner argues that Defiel was aware of red flags at the outset, as evidenced by Defiel asking his financial advisor at Ameriprise whether he should invest in the Cook foreign currency program. (Defiel Dep. at 35, Ex. 99 to Jansen Decl. [Doc. No. 197-33].) As with other Investor Respondents, Petitioner identifies as red flags the fact that Defiel received statements from an entity unknown to him, Oxford, and that Berg cashed out his investment, unsolicited. (Pet'r's Mem. Supp. Mot. for Summ. J. at 65 [Doc. No. 193].) Defiel received the check from his friend John Dzik, who had

received the check from Berg, although Dzik was not a signatory on Defiel's account. (Id.) As with other Investor Respondents, Petitioner also argues that the following served as red flags: Defiel's account closing was unaccompanied by any documentation, or written notice, and he paid no early redemption fees. (Id.)

Defiel maintains that because both Dzik and Cheney invested in the Cook Entities, and because he considered them to be knowledgeable investors, he chose to invest. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 85 [Doc. No. 202].) He contends that he was not informed about the existence of an SEC investigation. (Id. at 84].) As an inexperienced investor, he received his cashier's check from John Dzik, who informed him that Cook's currency trading business was moving to Charles Schwab. (Id.) Defiel therefore contends that he was not on inquiry notice of fraudulent activity or insolvency. (Id. at 85.)

### (6) George and Karen Morisset

Petitioner argues that George and Karen Morisset were on inquiry notice for many of the reasons stated with respect to the other Investor Respondents – they did not ask for their accounts to be closed, nor did they provide or receive written notice to close them. (Pet'r's Mem. Supp. Mot. for Summ. J. at 66 [Doc. No. 193].) Petitioner points to Karen Morisset's testimony that she found it "odd" that their friend Walter Defiel received unsolicited cashier's checks payable to the Morissets, cashing out their accounts. (K. Morisset Dep. at 23, Ex. 105 to Jansen Decl. [Doc. No. 197-35].) Karen Morisset testified that she called Cook's headquarters the following day to determine why they had received

the checks, but she received no response.  (Id. at 40.)   Petitioner contends that as a loan

officer, Karen Morisset testified that she was unaware of another principal-protected

investment option offering more than 6% at the time.  (Pet'r's Mem. Supp. Mot. for

Summ. J. at 68 [Doc. No. 193].)   Moreover, Petitioner argues that additional red flags

existed: the Morissets received no documentation or statements, even when their accounts

were closed, and their qualified IRA money bypassed the custodian of the investment.

(Id.)

        The Morissets maintain that they received the transfer from Walter Defiel in good

faith.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 50; 93 [Doc. No. 202].)  They

maintain that they had no knowledge of an investigation prior to the closing of their

accounts. (Id. at 93.)  They were curious enough to call Ryan Moeller to inquire further,

but argue that this does not constitute a red flag.   (Id.)  To the contrary, the Morissets

argue, it demonstrates good faith, because had they known of any improper purpose

behind the transfer, they would not have taken the step of inquiring.  (Id.)  Any other red

flags, the Morissets argue, are common to all investors in the Cook Currency Entities.

They therefore argue that they are entitled to summary judgment. (Id.)

### (7)    Reynold Sundstrom

Petitioner contends that Reynold Sundstrom was on inquiry notice of the fraudulent

nature of the transfer he received.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 71 [Doc. No.

193].)  Petitioner points to Sundstrom's testimony that, even prior to participating in

Cook's foreign currency program, which sounded "awful good," Sundstrom asked his

attorney to see "if there's something wrong with it." (Id. at 69) (citing Sundstrom Dep. at 39, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)  Sundstrom also testified that he was unaware of any other investment opportunities at the time that offered a rate of return like Cook's program.  (Id.) (citing Sundstrom Dep. at 78, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)  Despite any personal misgivings about "something wrong," Sundstrom testified that he relied on his connection to Berg. (Sundstrom Dep. at 63, 65, 190, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)  Petitioner argues that the circumstances of the transfer to Sundstrom demonstrate a lack of good faith, noting that Berg phoned Sundstrom in 2009, telling him of the investigation and cashing him out.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 70 [Doc. No. 193].)  Sundstrom's Power of Attorney agreement prohibited any agent from withdrawing or delivering payments on Sundstrom's account.  (R. Sundstrom Power of Attorney, Ex. 119 to Jansen Decl. [Doc. No. 194-3].)  Sundstrom testified that he assumed that he had received his check because he trusted Berg to watch out for him. (Sundstrom Dep. at 113, 197, Ex. 112 to Jansen Decl. [Doc. No. 197-36].)  Petitioner points to the following additional facts as red flags: Sundstrom's cashier's check was unaccompanied by any receipt, final statement, or other documentation; Sundstrom was not charged an early redemption fee, and had not received written notice of the closing of the account.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 72 [Doc. No. 193].)

Sundstrom, however, maintains that as an inexperienced investor, he was in no position to be aware of any red flags suggesting fraud or insolvency.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 94 [Doc. No. 202].)  He contends that Berg informed

him that the investigation did not affect the Cook Currency Entities. (Id.) Nonetheless, Berg told him that Cook was moving his trading business to Charles Schwab. Sundstrom trusted Berg and planned to invest again with Cook at Charles Schwab. (Id.) Sundstrom maintains that he did not find it unusual that he was not charged any fees or penalties for the withdrawal of his funds, as he assumed that they had been waived because of the anticipated move to Charles Schwab. (Id.) He contends that his plans to reinvest with Schwab indicate that he was not suspicious about the Cook Currency Entities and that he received his funds in good faith. (Id.)

### (8)  Steven Kautzman

As to investor Steven Kautzman, Petitioner argues that he was also on inquiry notice. (Pet'r's Mem. Supp. Mot. for Summ. J. at 74 [Doc. No. 193].) Petitioner refers to testimony from Kautzman in which he stated that he instructed Berg to protect him and ensure that he would get his money back "if there's ever anything going on." (Kautzman Dep. at 160, Ex. 120 to Jansen Decl. [Doc. No. 197-37].) In late June 2009, Berg told Kautzman that one of Cook's partners, Bo Beckman, was "having some issues," leading Berg to close Kautzman's account. (Id. at 52.) Kautzman's Power of Attorney agreement prohibited any agent from withdrawing or delivering payments on Kautzman's account. (Kautzman Power of Attorney, Ex. 123 to Jansen Decl. [Doc. No. 194-3].) Petitioner cites to Kautzman's testimony that, in cashing out Kautzman's investment, Berg "performed" on their agreement. (Kautzman Dep. at 161, Ex. 120 to Jansen Decl. [doc. No. 197-37].)

As with many of the other Investor Respondents, Petitioner contends that the following red flags placed Kautzman on inquiry notice: Kautzman neither provided nor was provided withdrawal forms or written notice; his cashier's check was not accompanied by receipts, final statements or documentation; and while Kautzman had invested qualified IRA money through third-party custodian Entrust, his distribution came directly from the Cook Entities and not the custodian. (Pet'r's Mem. Supp. Mot. for Summ. J. at 75 [Doc. No. 193].) Petitioner therefore contends that Kautzman remained willfully ignorant of the illegitimacy and insolvency of Cook's scheme and cannot establish the good faith defense. (Id.)

Kautzman contends that he was not on inquiry notice of possible fraud or insolvency. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 92 [Doc. No. 202].) He maintains that he received word from Cliff Berg that there was a problem with one of Cook's partners, that other investors were withdrawing their investments, and that Cook himself was moving his currency trading business to Charles Schwab. (Id.) Kautzman notes that after he received his funds, he inquired further about investing with Cook. (Id.) He maintains that he was not aware of an investigation, but simply a "problem," with one of Cook's partners. Kautzman argues that he received his funds in good faith and is entitled to summary judgment. (Id.)

### (9)     Cynthia and Michael Hillesheim

Petitioner argues that the Hillesheims were on inquiry notice in light of a variety of red flags. Petitioner points to the Hillesheims' instruction to Berg to close their accounts if

Berg had any concerns.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 78 [Doc. No. 193].)

Cynthia Hillesheim testified to her belief that Berg acted on those instructions when he

called her, announcing that he had their checks.  (C. Hillesheim Dep. at 138, Ex. 128 to

Jansen Decl. [Doc. No. 197-39].)  Petitioner notes the following as additional red flags:

the Hillesheims did not complete any withdrawal forms and/or receive any written notice

regarding the withdrawal of their investments; their cashier's checks were not

accompanied by receipts, final statements or any other documentation; and the money that

they received bypassed the third-party custodian.  (Pet'r's Mem. Supp. Mot. for Summ. J.

at 78-79 [Doc. No. 193].)  Petitioner therefore argues that the Hillesheims remained

willfully ignorant.  (Id.)

The Hillesheims argue that they did not have notice of an SEC investigation prior to

receiving their transfer.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 90 [Doc. No.

202].)  They contend that after they received the funds, Cynthia Hillesheim called Berg,

requesting advice on where to reinvest the money.  (Id.) (citing C. Hillesheim Dep. at 63,

Ex. 17 to Jansen Decl. [Doc. No. 194-2].)  This, they argue, was "an indisputable sign that

[they] were not aware of fraud or insolvency."  (Id.)  The Hillesheims, who received their

cashier's checks in the mail, concede that they understood that qualified funds must be

returned through a third-party custodian.  They contend, however, that they had no way of

knowing whether the cashier's checks had been purchased by the Cook Entities or by a

third-party custodian.  (Id.)  They believed that Berg had liquidated their accounts because

of an adjustment on a rate of return.  (Id.)  The Hillesheims thus argue that they were

aware of no red flags to place them on inquiry notice.  (Id.)

### (10)  James McIntosh

Petitioner contends that on or about June 30, 2009, Cliff Berg called James McIntosh to relay the news of the SEC investigation.  (McIntosh Dep. at 217, Ex. 150 to Jansen Decl. [Doc. No. 197-40].)  Berg told McIntosh that Bo Beckman was the focus of the investigation and advised McIntosh to "get out."  (Id. at 162-64.)  Petitioner notes that McIntosh completed no paperwork for his withdrawal, did not provide or receive written notice for the closure of his account, did not direct Entrust to send him any funds beyond a series of monthly distributions of "interest" that he had received for eleven months, was not charged any fees for early withdrawals, received his money without it having gone through Entrust, the account custodian, and continued to receive two more payments of monthly "interest," even after the account was apparently closed.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 83 [Doc. No. 193].)  All of these facts, Petitioner contends, amount to red flags – arguing that James McIntosh was on inquiry notice of fraudulent activity or insolvency.  (Id. at 84.)

McIntosh argues that he received his funds in good faith.  He maintains that Berg informed him of an investigation into Bo Beckman's trading firm and recommended that McIntosh withdraw his money.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 92 [Doc. No. 202].)  McIntosh requested the withdrawal and received a cashier's check.  (Id.) He argues that he was not on notice of any red flags indicating fraud or insolvency.  (Id.)

### (11)   David Buysse

Petitioner identifies a variety of red flags with respect to Respondent David Buysse. First, Petitioner notes a $50,000 cash deposit – in the form of $100 bills for which Buysse received no receipt – as contrary to industry norms and inconsistent with an arms-length transaction.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 86 [Doc. No. 193] (citing Buysse Dep. at 93, Ex. 158 to Jansen Decl. [Doc. No. 197-42].)  In addition, Petitioner points to statements that Buysse received from entities other than those in which he had invested, and about which Buysse never inquired.  (Id.)  Petitioner further highlights Berg's call to Buysse in late June 2009, telling him that his account had been closed without Buysse's request, signature, or written notice.  (Id.)   Buysse's Power of Attorney agreement prohibited any agent from withdrawing or delivering payments on Buysse's account. (Buysse Power of Attorney, Ex. 163 to Jansen Decl. [Doc. No. 194-3].)  As with many of the Respondents, Petitioner identifies as a red flag the fact that Buysse received his cashier's check without any receipt, final statement, or other paperwork.  (Id.)  In light of these facts, Petitioner argues that a reasonable person would have suspected that the cashier's check that Buysse received in June 2009 was not the product of an arms-length transaction.  (Id.)  Therefore, Petitioner argues that the only reasonable inference is that Buysse was on inquiry notice as to the fraudulent nature of the transfer or the insolvency of Cook's scheme.  (Id.)

Buysse responds that the only red flag applicable to him was the manner in which he received his money.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 82 [Doc. No.

202].)  Berg phoned David Buysse, told him that his account was being shut down and that

the funds in his account would be given to him.  (Id. at 82-83.)  He contends that he

received a cashier's check for the correct amount.  (Id. at 83.)  In addition, Buysse argues

that his account agreements provided that the Cook Currency Entities had the power to

liquidate accounts and distribute funds.  (Id.)  Buysse therefore argues that a reasonable

investor of his experience would not suspect fraud or insolvency from the distribution of

these funds.  (Id.)

### (12)   Terry Frahm

Petitioner argues that Terry Frahm, an experienced investor, was on inquiry notice.

(Pet'r's Mem. Supp. Mot. for Summ. J. at 90 [Doc. No. 193].)   Petitioner points to facts

showing that in the spring of 2009, Frahm phoned Cook to ask about the tax consequences

of his investments.  (Id.)  Frahm told investigator David Austrum that he "got a bad

feeling" and felt "uncomfortable with Cook" based on Cook's responses to his taxation

questions.  (Austrum Dep. at 53, Ex. 189 to Jansen Decl. [Doc. No. 197-48].)  He

questioned whether his invested, qualified IRA money was actually in a qualified account

and he decided to close his accounts.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 90 [Doc.

No. 193].)  Petitioner questions whether Frahm actually sent a letter in May 2009 asking

Cook to close his accounts, particularly as there is no signed copy of the letter in question

in the record.  (Id. at 91.)   Frahm's Power of Attorney agreement prohibited any agent

from withdrawing or delivering payments on Frahm's account.  (Frahm Power of

Attorney, Ex. 175 to Jansen Decl. [Doc. No. 194-3].)

Petitioner notes that when Berg delivered Frahm's checks, he explained that an "audit" or "investigation" was underway. (Pet'r's Mem. Supp. Mot. for Summ. J. at 90 [Doc. No. 193]) (citing J. Frahm Dep. at 48, Ex. 166 to Jansen Decl. [Doc. No. 197-44].) Petitioner argues that if the closure of Frahm's account truly stemmed from Frahm's own request, there would have been no need for Berg to volunteer an explanation for the delivery of the checks. (Pet'r's Mem. Supp. Mot. for Summ. J. at 90. [Doc. No. 193].) Moreover, Petitioner argues, the funds did not reflect any early withdrawal fees, and the checks were delivered without any accompanying receipt, final statement, or documentation. (Id. at 90-91.) Furthermore, Petitioner notes that the checks ostensibly included qualified IRA money, which Frahm had requested to be rolled over into an Oxford equities program. (Id.) The funds were not rolled over, however, but were given to Frahm by Berg. (Id. at 91.) Petitioner argues that this directly violated the Entrust agreement that Frahm had signed, in which he had crossed out the power of attorney provision that would have given Cook authority to directly withdraw the funds. Moreover, Petitioner contends, the funds bypassed Entrust entirely, and Frahm was not charged an account termination fee. (Id. at 91.) Even if Frahm sent the May 2009 letter to close his accounts, Petitioner argues that Frahm knew or should have known that his request did not follow the agreed-upon procedures. (Id. at 91-92.) For all of these reasons, and in light of Frahm's experience as an investor, Petitioner contends that Frahm was on inquiry notice as to the fraudulent nature or insolvency of Cook's operation.

Frahm, however, argues that he did, in fact, request the return of his funds by letter

in May 2009. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 85 [Doc. No. 202].)

Frahm contends that he sought to withdraw his funds not because of any discomfort with

Cook, but because he was eager to reinvest in the equities market. (<u>Id.</u> at 86.) Frahm also

asserts that his "request that his IRA account be 'rolled over' to Bo Beckman's business is

persuasive evidence that Frahm had no knowledge of any fraud or insolvency." (<u>Id.</u>) He

also contends that he was not specifically informed about the SEC investigation – Berg

referred to an audit or investigation – upon receiving the checks, nor afterward. (<u>Id.</u> at 86-

87.) For these reasons, as well as the reasons generally applicable to the Investor

Respondents, Frahm contends that he is entitled to summary judgment.

### b. Dot Anderson

Petitioner argues that Dot Anderson was also on inquiry notice. (Pet'r's Mem.

Supp. Mot. for Summ. J. at 98 [Doc. No. 193].) Petitioner notes that Anderson read a

newspaper article about the fraud, called her grandson, asked if it was possible to get her

money back, and subsequently got her money back. (<u>Id.</u> at 97.) Petitioner contends that,

at a minimum, Anderson's knowledge of the Phillipses' lawsuit placed her on inquiry

notice that the subsequent transfer to her was not made in good faith. (<u>Id.</u>) Petitioner

notes that once the funds were wired back to Anderson's bank account, Anderson engaged

in no further investigation. (<u>Id.</u> at 98.) Petitioner also contends that Anderson was not

charged early withdrawal fees, despite her grandson explaining to her that she would be

charged such fees. (<u>Id.</u> at 97.) Petitioner also identifies as red flags the fact that Anderson

was promised a 10.5% rate of return with no risk and that her payment came from Basel,

even though she believed that she had invested in Oxford. (Id. at 98.) Petitioner therefore argues that Anderson was on inquiry notice that Cook's investment program was either fraudulent or insolvent.

Anderson, however, argues that she acted in good faith, having no knowledge or reason to suspect any fraudulent activity or insolvency.[13] (Anderson's Mem. Supp. Mot. for Summ. J. at 21 [Doc. No. 189].) She notes that the account opening documents gave her the unrestricted right to close her account. (Basel Customer Agreement at IR003237, Ex. 11 to Decl. of Adam S. Huhta [Doc. No. 191-2].)

Anderson argues that knowledge of a lawsuit against a transferor has been held insufficient to preclude a finding of good faith. (Anderson's Mem. Supp. Mot. for Summ. J. at 22 [Doc. No. 189]) (citing Rucker v. Steelman, 619 S.W.2d 5, 7 (Tex. Civ. App. 1981). Therefore, Anderson contends, the fact that the Phillips had filed suit does not preclude a finding of good faith. In addition, Anderson cites to the deposition testimony of Grant Grzybowski and Ryan Moeller, both Cook employees, who testified that in the

---

[13] Procedurally, Anderson argues that the Receiver has failed to allege that she was on inquiry notice of any fraudulent intent and therefore should not be permitted to argue otherwise. She cites to Petitioner's answer to an interrogatory in which he was asked to identify all facts upon which he relied for his assertion that Anderson did not take her funds in good faith. Petitioner indicated that Anderson knew of the Phillipses' lawsuit and decided to close her account. (Receiver's First Supp'l Objs. and Resp. to Anderson's Interrogs. at No. 11, Ex. 7 to Huhta Decl. [Doc. No. 190-7].) Anderson argues that because the Receiver failed to allege that Anderson was on inquiry notice, he should not now be able to make this argument. The Court disagrees with Anderson's contention. Respondent Anderson bears the burden of presenting her good faith defense. The requirement of inquiry notice is well-established and Petitioner was not required to allege it in response to Anderson's discovery.

summer of 2009, they had no knowledge that any of the Cook Entities were part of a Ponzi

scheme. (Grzybowski Dep. at 187, Ex. 2 to Huhta Decl. [Doc. No. 190-2]; Moeller Dep.

at 28-29, Ex. 4 to Huhta Decl. [Doc. No. 190-4].) For all of these reasons, in addition to

the reasons asserted by all Respondents regarding the effect of Chief Judge Davis' Order

on attorney's fees, and on grounds of futility, Anderson contends the good faith defense

applies and summary judgment is appropriate.

> ### c.     Summary Judgment on Good Faith is Precluded by Genuine Issues of Material Fact in Dispute

The foregoing recitation of the parties' positions and supporting facts reveals ample

disputed issues of material fact as to Respondents' good faith defense. Summary

judgment on the issue of good faith is therefore not appropriate. This determination

acknowledges the very fact-intensive nature of a good faith defense, as recognized by

other courts, for which good faith is analyzed on a case-by-case basis. In re Sherman, 67

F.3d at 1355. As to each Respondent, there are material disputes as to whether certain

facts demonstrate that a reasonable investor knew or should have known (or did not know

or should not have known) of the fraudulent nature of the transfer or of the Cook Entities'

insolvency, including, e.g., the lack of formal paperwork upon closing of the accounts, the

unsolicited nature of the cashier's checks for many of the Respondents, the relatively high

rates of return, the "handshake agreements" with Berg to cash out in the event of

"problems," the willingness on the part of some Investor Respondents to continue

investing with Cook if he moved his business, and the professed lack of knowledge of

certain Cook employees' in the Ponzi scheme. As to these facts and others identified by the parties, there are genuine disputes of material fact as to what Respondents knew or should have known. It is the presence of sufficient red flags that triggers inquiry notice. Because there are disputes of fact regarding the alleged red flags, the Court cannot resolve the issues of diligent investigation and futility on summary judgment. The Court observes, however, that while Respondents have submitted evidence supporting their futility arguments, they have offered little, if no, evidence demonstrating that they engaged in a diligent investigation.

The Investor Respondents argue, on both substantive and procedural grounds, that Petitioner may not assert that Cliff Berg functioned as their agent. (Investor Resp'ts' Opp'n Mem. at 38-56 [Doc. No. 225].) Procedurally, Respondents' argument is without merit. The Petition makes plain that the Investor Respondents invested in the Cook Entities through Berg, either directly, or indirectly. (See, e.g., Pet. ¶ 31(b) [Doc. No. 1] (alleging, ". . . Respondent Steven Cheney was a personal acquaintance of Berg from his involvement in the carpet industry. Through Berg, Cheney invested $1,519,999.51 in the Trading Program. . . .); ¶ 31(j) (alleging, " . . . Respondent Larry Hopfenspirger learned about the scheme through Respondent Steven Cheney.") The Petition further alleges that Berg was aware of the SEC investigation no later than June 26, 2010. (Id. ¶ 30.) In addition to the pleadings, the deposition testimony of the Investor Respondents, as discussed herein, is replete with references to Berg's involvement, including his actions in cashing out the Investor Respondents and/or delivering cashier's checks to them.

Therefore, the issue of Berg's agency has been squarely before the parties and there is no procedural failing.

.       As to the Investor Respondents' substantive argument, while a determination as to whether Cliff Berg was an agent of any of the Investor Respondents is a matter for the Court, the underlying factual disputes must be resolved at trial before any finding can be made.   For purposes of these motions, however, Petitioner offers evidence independent of Berg, as well, that demonstrates questions of fact as to the Investor Respondents' good faith.

Respondents rely on Chief Judge Davis' January 27, 2010 ruling on attorney's fees, arguing that it represents the law of the case on the subject of inquiry notice.  (See Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 96-97 [Doc. No. 202].)  Respondents also invoke the ruling as the basis for their asserted defenses of res judicata, collateral estoppel, merger and bar, discussed in more detail herein.  The Court finds that the attorneys' fees order is neither preclusive nor determinative of the presence of good faith.  The scope of Chief Judge Davis' Order was confined to the knowledge and actions of counsel – it did not contemplate the knowledge and actions of investors.  (Order of 1/27/10, SEC Case, 09-CV-3332 [Doc. No. 186], Ex. 203 to Jansen Decl. [Doc. No. 197-53].)  Rather, the attorneys sought clarification from Chief Judge Davis that the Asset Freeze Order did not apply to payments made to them before that Order was entered.   There was no claim against the attorneys for fraudulent transfer or unjust enrichment. The attorneys' fees decision was supported by law recognizing non-refundable earned-upon-receipt fee

agreements, which Chief Judge Davis found each attorney had in place prior to the entry of the Asset Freeze Order. (Id. at 5-6.) Moreover, while Chief Judge Davis considered whether counsel knew or should have known that the source of their clients' funds came from a fraudulent scheme, Respondents fail to demonstrate any connection between facts known to Respondents and facts known to Cook's attorneys. The Court therefore finds that Chief Judge Davis' attorneys' fees ruling is not determinative of Respondents' good faith.

As noted, under the MUFTA, a transfer is not void if it is taken in good faith and for reasonably equivalent value. Minn. Stat. § 513.48. Respondents contend that they provided reasonably equivalent value for the funds they received, including contractual interest. (See Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 58-59 [Doc. No. 2020.]) Petitioner, however, argues that Respondents provided no "value" by investing in a fraudulent Ponzi scheme. (Petitioner's Opp'n Mem. at 138 [Doc. No. 207].)

"The critical time to determine whether a debtor receives reasonably equivalent value is the time of the transfer." Armstrong v. Collins, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, *34 (S.D.N.Y. Mar. 24, 2010) (quoting Slone v. Lassiter (In re Grove–Merritt), 406 B.R. 778, 805 (Bankr. S.D. Ohio 2009)). The court looks at what "value" the debtor received in return for the transfer, and then determines whether the value received is reasonably equivalent. Id. (citing Kipperman v. Onex Corp., 411 B.R. 805, 837 (N.D. Ga. 2009)). "Whether reasonably equivalent value has been given 'is typically a question of fact.'" Id. (quoting Wachovia Sec., LLC v. Neuhauser, 528 F.

Supp.2d 834, 859 (N.D. Ill. 2007)).

Determining reasonably equivalent value in a Ponzi scheme is often interrelated to the issue of good faith. As the court in Armstrong v. Collins explained that "[b]y 'investing' in a Ponzi scheme run by the debtor, even unwittingly, a person does not – strictly speaking – provide 'value.' This is because the money invested simply perpetuates the debtor's fraudulent scheme: 'the longer a Ponzi scheme is kept going the greater the losses to the investors.'" Armstrong, 2010 WL 1141158, at *22 (quoting Scholes, 56 F.3d at 757). But courts generally hold that "a defrauded investor in a Ponzi scheme gives 'value' to the debtor in the form of a dollar-for-dollar reduction in the investor's restitution claim against the Ponzi scheme." Id. at *22. In a fraudulent transfer action brought under an actual fraud theory,

> the receiver may recover the entire amount paid to the winning investor, including amounts which could be considered "return of principal." However, there is a "good faith" defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay.

Donell v. Kowell, 533 F.3d 762, 771 (9th Cir. 2008) (emphasis in original).

The Court finds that genuine disputes of material fact exist regarding a determination of reasonably equivalent value, particularly because this determination is related to a determination of Respondents' good faith. For all of these reasons, the parties' motions for summary judgment as to Respondents' affirmative defense are therefore denied.

### 3.    Unjust Enrichment

Petitioner seeks the return of Respondents' distributions under the theory of unjust enrichment, arguing that Respondents' retention of the funds at the expense of other defrauded investors violates fundamental principles of equity.  (Petition ¶ 45 [Doc. Nos. 1 & 2].)    Pointing to Respondents' "insider" connections – Cliff Berg, in the case of the Investor Respondents, and Grant Grzybowski, in the case of Dot Anderson – Petitioner contends that the facts demonstrate that Respondents were unjustly enriched by their respective transfers and, therefore, Petitioner is entitled to summary judgment on his unjust enrichment claim.  (Pet'r's Mem. Supp. Mot. for Summ. J. at 99-109 [Doc. No. 193].)

Respondents, however, also move for summary judgment on the unjust enrichment claim and oppose Petitioner's motion, arguing that their distributions were made pursuant to valid, enforceable contracts.  (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 57-59 [Doc. No. 202]; Anderson's Mem. Supp. Mot. for Summ. J. at 26-28 [Doc. No. 189].) Characterizing their transfers as the repayment of the principal from valid loan agreements, the Investor Respondents argue that they could not have been enriched, as a matter of law.  (See Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 51 [Doc. No. 202]) (citing In re M & L Bus. Mach., 84 F.3d at 1342).  While Anderson does not characterize her contract as a loan, she argues that it was a valid unilateral contract that entitled her to the transfer.  (Anderson's Mem. Supp. Mot. for Summ. J. at 26-28 [Doc. No. 189].)

Petitioner, however, contends that no valid contracts entitled Respondents to the funds in question. Petitioner contends that Respondents had the same contracts as all the other investors in Cook's Ponzi scheme, and, but for Respondents' connections to Berg and Grzybowski, Respondents' money would have remained in Cook's collapsing Ponzi scheme. (Pet'r's Opp'n Mem. at 134 [Doc. No. 207].) Petitioner maintains that the contracts were mere Ponzi scheme props, used to perpetuate a fraud. As such, Petitioner argues, the contracts lacked the requisite meeting of the minds necessary to the formation of a contract. (Pet'r's Mem. Supp. Mot. for Summ. J. at 100 [Doc. No. 193].) Even if there had been a meeting of the minds, Petitioner argues that contracts for the sale of unregistered securities are void as a matter of law. (Pet'r's Mem. Supp. Mot. for Summ. J. at 99-109 [Doc. No. 193].) Petitioner further contends that the agreements themselves fail to meet the basic requirements of contract law and the parties failed to abide by the terms of the agreements.

A claimant asserting a claim for unjust enrichment must show that the other party "knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit its retention." Brown, 643 F. Supp.2d at 1083 (quoting Southtown Plumbing, Inc. v. Har–Ned Lumber Co., Inc., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)). "An action for unjust enrichment does not lie simply because one party benefits from the efforts of others; instead, it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully." Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) (quotation

omitted). An unjust enrichment claim "may be founded on failure of consideration, fraud, or mistake, or situations where it would be morally wrong for one party to enrich himself at the expense of another." Mon–Ray, Inc. v. Granite Re, Inc., 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) (quotation omitted), review denied (Minn. June 29, 2004).

Unjust enrichment is an equitable claim and under Minnesota law "'[a] party may not have equitable relief where there is an adequate remedy at law available.'" In re Levaquin Prods. Liab. Litig., 752 F. Supp.2d 1071, 1081 (D. Minn. 2010) (quoting ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)). However, in many circumstances, Federal Rule of Civil Procedure 8(d) permits a party to plead in the alternative, asserting both legal claims and equitable claims for unjust enrichment. See Daigle v. Ford Motor Co., 713 F. Supp.2d 822, 828 (D. Minn. 2010) (permitting simultaneous pleading of breach of warranty claim and unjust enrichment claim on a motion to dismiss); see also TCS Holdings, Inc. v. Onvoy, Inc., No. 07-CV-1200 (DWF/AJB), 2007 WL 2226025, at *5 (D. Minn. Aug. 1, 2007) (permitting an unjust enrichment claim to remain in suit as an alternative theory in the event that the applicable contract was determined to be invalid). But see Arena Dev. Grp., LLC v. Naegele Commc'ns, Inc., No. 06–2806, 2007 WL 2506431, at *11 (D. Minn. Aug. 30, 2007) (rejecting plaintiffs' argument that "if their fraudulent transfer claims fail, they will not have an adequate remedy at law, making their unjust enrichment claim viable"). As this Court found in In re Levaquin, "[t]he particular holdings of ServiceMaster and other state law cases cited by defendants are that a plaintiff who chooses not to pursue available

remedies at law cannot recover under principles of equity." In re Levaquin Prods. Liab. Litig., 752 F. Supp.2d at 1081. Here, as in In re Levaquin, Petitioner is pursuing a legal claim under the MUFTA, and, in the alternative, an equitable claim of unjust enrichment. Under ServiceMaster, this is permissible.

In a related vein, it is the general rule that there can be no claim for unjust enrichment under Minnesota law where an express contract exists. "[E]quitable relief cannot be granted where the rights of the parties are governed by a valid contract." United States Fire Ins. v. Minn. State Zoological Bd., 307 N.W.2d 490, 497 (Minn. 1982); see also M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 616 F.3d 872, 880 (8th Cir. 2010) (finding that unjust enrichment "does not apply where the rights of the parties are governed by a valid contract" under Minnesota law).

Here, however, the contracts were obtained through fraud, as instruments of the Ponzi scheme. Cook pled guilty to criminal counts arising out of the operation of a Ponzi scheme. (Cook Plea Agreement, Ex. 1 to Jansen Decl. [Doc. No. 196].) Respondents' agreements, purporting to define the parties' rights and obligations as to the foreign currency investment program, were part of the fraudulent scheme. "If a contract is entered into based on a misrepresentation that is either material or fraudulent, it is voidable." Moratzka v. Loop Corp. (In re Health Risk Mgmt., Inc.), 319 B.R. 181, 188 (Bankr. D. Minn. 2005) (citing Carpenter v. Vreeman, 409 N.W.2d 258, 260–261 (Minn. Ct. App. 1987). In Cummings v. Paramount Partners, L.P., this Court denied a motion to dismiss an unjust enrichment claim, rejecting the defendants' argument that certain contracts

91

authorized payments:

> Defendants' argument . . . utterly disregards the fact that Plaintiffs have alleged these contracts were procured through fraud.  If fraud is proven, then the moving Defendants would have been enriched through illegal or unlawful means.  Therefore, any benefits conferred on Defendants through the allegedly fraudulently induced investments are plausibly recoverable through the unjust enrichment claim.

715 F. Supp.2d 880, 911 (D. Minn. 2010); see also, TCS Holdings, Inc., 2007 WL 2226025, at *5 (denying motions to dismiss unjust enrichment claim in which the plaintiff had alleged a contract was invalid because there was no meeting of the minds due to the defendant's fraud).

Furthermore, "[a] contract violating law or public policy is void." Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 671 N.W.2d 213, 217 (Minn. Ct. App. 2003) (citation omitted).   Thus in Hays v. Adam, 512 F. Supp.2d 1330, 1342 (N.D. Ga. 2007), the court held that the purported  "agreements" were void: "Because the act of performance under the contracts necessarily resulted in violation of federal securities laws by the defendants, the court holds that the contracts were void and thus do not bar the Receiver's claim for unjust enrichment."

Providing its rationale for disallowing the enforcement of such contracts, the court in In re Indep. Clearing House observed:

> To allow an [investor] to enforce his contract to recover promised returns in excess of his [investment] would be to further the debtors' fraudulent scheme at the expense of other [investors].
>
> . . . Any recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own. Rather, any award of

damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.

77 B.R. at 858.

In support of their position that valid contracts preclude Petitioner's unjust enrichment claim, Respondents cite to a Minnesota state court Ponzi scheme clawback case, Finn v. Alliance Bank, No. 19HA-CV-11-2856, 2011 WL 5006458, at *7 (Dakota Cty. Dist. Ct. April 16, 2011).[14] There, the district court found that because the transfers were made as payments for contractual debts, the receiver's claims for unjust enrichment failed as a matter of law. Id. This opinion is not controlling authority and Court finds it to be contrary to the weight of authority. See Cummings, 715 F. Supp.2d at 911; TCS Holdings, Inc., 2007 WL 2226025 at *5; Hays, 512 F. Supp.2d at 1342. As Petitioner notes, the opinion does not address the validity of the contracts in any detail, but merely assumes that the contracts in question were valid. Finn, 2011 WL 5006458, at *7. Moreover, the cases on which the district court relied did not involve Ponzi schemes, and were cited for the general proposition that unjust enrichment actions will not lie where a valid contract determines the parties' rights. Id. (citing Schaaf v. Residential Funding Corp., 517 F.3d 544, 554 (8th Cir. 2008); Stein v. O'Brien, 565 N.W.2d 472, 474 (Minn.

_____

[14] The Minnesota state court case is related to the same Ponzi scheme at issue in Finn, 2012 U.S. Dist. LEXIS, at *20, discussed supra, in which the United States District Court for the Western District of Wisconsin entered summary judgment for the receiver on his fraudulent transfer claim. In the federal action, the court found that "Peoples Bank's loan was annually renewed as part of, and ultimately repaid with, the fraudulently-obtained proceeds of a massive Ponzi scheme and, therefore, all of its profit [was] subject to recapture." Id. at *2-3. Although the Wisconsin federal action included a claim for unjust enrichment, the opinion does not address it.

Ct. App. 1997); <u>Sharp v. Laubersheimer</u>, 347 N.W.2d 268, 271 (Minn. 1984)).

The Investor Respondents cite to similar cases which stand for the same proposition, i.e., that equitable relief is inapplicable in the presence of a valid contract. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 57 [Doc. No. 202]) (citing <u>Sterling Capital Advisors, Inc. v. Herzog</u>, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998); <u>Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Can., Ltd.</u>, 552 N.W.2d 254, 268 (Minn. Ct. App. 1996)). The Court agrees with this general proposition, but the proposition requires proof of a valid contract, which is lacking here. Likewise, because the agreements here are unenforceable for the variety of reasons identified, the Court rejects the Investor Respondents' strained argument that the "relinquishment of their contractual claims for damages against the Cook Currency Entities was full and fair consideration for the payments they received." (Investor Resp'ts' Reply Mem. at 27 [Doc. No. 237]) (citing <u>Kirby v. Dean</u>, 199 N.W. 174, 175 (Minn. 1924)). The Court also finds that Respondents' reliance on a trio of fraudulent transfer cases is unavailing with respect to Petitioner's unjust enrichment claim. (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 58 [Doc. No. 202] (citing <u>In re M & L Bus. Mach.</u>, 84 F.3d at 1342, <u>In re Unified Commercial Capital</u>, 2002 WL 32500567, <u>In re Carrozzella & Richardson</u>, 286 B.R. at 480; (Anderson's Mem. Supp. Mot. for Summ. J. at 27 [Doc. No. 189].)

The Court therefore rejects Respondents' general contention that the existence of enforceable contracts prohibit Petitioner's claim for unjust enrichment. The contracts here are void as they were procured by fraud and perpetuated a fraud. As such, the agreements

lacked mutual assent.  "Mutual assent entails a 'meeting of the minds concerning [a

contract's] essential elements.'"  <u>Christianson v. Jansen</u>, No. A11-1833,  2012 WL

2368914, at *1 (Minn. Ct. App. June 25, 2012) (quoting <u>SCI Minn. Funeral Servs., Inc. v.

Washburn–McReavy Funeral Corp.</u>, 795 N.W.2d 855, 864 (Minn. 2011) (internal citation

omitted).

Moreover, the purported contracts fail to meet the basic requirements of contract

law.   In the exhibits accompanying the Investor Respondents' summary judgment motion,

they identify three of the agreements as representative types of agreements – a purported

Demand Note/Subscription Form, a Crown Forex Customer Trading Agreement, and a

Power of Attorney Agreement.  The representative Demand Note/Subscription Form was

signed by Investor Respondent David Buysse.   (Buysse Demand Note/Subscription Form,

Ex. 21 to Magnuson Decl. [Doc. No. 203-21].)  While the document bears Buysse's

signature, it bears no signature on the part of Oxford Global Advisors, the obligor (<u>id.</u> at

IR007270), nor does it indicate the amount to be provided by the obligee, Buysse.  (<u>Id.</u>)

The representative Customer Power of Attorney Agreement, signed by Reynold Sundstrom,

is blank regarding the appointee given the power of attorney.  (Sundstrom Power of

Attorney Form, Ex. 23 to Magnuson Decl [Doc. No. 203-23].)

Not only do these documents lack key terms, even if they were to be considered

contracts, the parties failed to abide by the contractual language that purportedly entitled

them to the benefits they received.  Respondents' own actions demonstrate that the

contracts were essentially meaningless.  Respondents received a benefit, but in every

instance, the benefit was received in a manner outside the terms of the respective agreements.  For example, the Buysse Demand Note/Subscription Form provides that the "Customer and Company may terminate this Agreement at anytime by providing 30 days written notice to the other party."  (Buysse Demand Note/Subscription Form at IR007268, Ex. 21 to Magnuson Decl. [Doc. No. 203-21].)  No such written notice was provided.  (See Buysse Dep. at 14-16 [Doc. No. 197-42].)  Terry Frahm's Crown Forex Customer Trading Agreement provides that while Crown Forex reserves the right to close any accounts at any time without prior notice, in order for the customer to request a withdrawal, the customer must first complete a form.  (Frahm Crown Forex Customer Trading Agreement at IR010431, Ex. 22 to Magnuson Decl. [Doc. No. 203-22].)   In addition, the Customer Trading Agreement provides that "[w]ithdrawals will only be credited by wire transfer to the client personal bank account. . . ."  (Id.)   Frahm had not requested the return of his investment, yet he received the distribution directly, not to his bank account, but in the form of a cashier's check.  (T. Frahm Dep. at 13-14, Ex. 165 to Jansen Decl. [Doc. No. 197-43].)

While Dot Anderson's Oxford Management Agreement bears her handwritten signature and the typewritten signature of her "Advisor," grandson Grant Grzybowski, on behalf of Oxford Global Partners, it also denotes a contingent deferred sales charge upon account closing (Anderson Oxford Mgmt. Agreement, Ex. 184 to Jansen Decl. [Doc. No. 192-3]) – which Anderson was not charged.  (Grzybowski Dep. at 242-243, Ex. 13 to Jansen Decl. [Doc. No. 197-8].)  Likewise, her Basel Power of Attorney Agreement refers

to a redemption fee that Anderson was not charged. (Anderson Power of Attorney, Ex. 186 to Jansen Decl. [Doc. No. 192-3].)

Therefore, to the extent that Respondents contend that they were entitled to receive the transfers by virtue of contracts, this argument fails. Respondents, however, contend that they took the distributions in good faith and the circumstances surrounding the distributions does not render unjust the retention of those distributions. As to these elements of Petitioner's unjust enrichment claim – that Respondents were not entitled to receive the distributions and to permit the retention of the funds would be unjust – the Court finds that genuine issues of disputed fact remain, for the reasons set forth with respect to Respondents' good faith defense to Petitioner's fraudulent transfer claim. Accordingly, the parties' motions for summary judgment on the unjust enrichment claim are denied. To the extent, however, that Respondents rely on the purported agreements or contracts to establish entitlement to the funds, this argument is unavailing as the Court finds the contracts unenforceable and void as a matter of law.

### 4.    Respondents' Other Defenses

Petitioner also seeks summary judgment as to Respondents' additional defenses. Specifically, Petitioner moves for summary judgment on defenses identified by Respondents in their answers to contention interrogatories, i.e., Anderson's Final Amended Interrogatory Answers, served on October 24, 2011 (Ex. 200 to Jansen Decl. [Doc. No. 197-51]), and the Investor Respondents' Final Amended Interrogatory Answers, served on November 29, 2011 (Ex. 190 to Jansen Decl. [Doc. No. 197-49]). (See Pet'r's Mem. Supp.

Mot. for Summ. J. at 109 [Doc. No. 193].)   The defenses in question are: (1) failure to state

a claim; (2) estoppel, waiver, and laches; (3) failure to mitigate/election of remedies; (4)

accord and satisfaction; (5) doctrine of payment; (6) res judicata, collateral estoppel,

merger, and bar; (7) unclean hands, *in pari delicto*, preceding breach of contract; and (8)

damages by third parties.   In addition, Dot Anderson raises a defense of recoupment and

setoff and the right to assert a lien under the MUFTA.

### a.      Failure to State a Claim

Both the Investor Respondents and Dot Anderson contend that Petitioner fails to

state a claim under the theories of fraudulent transfer and unjust enrichment.   The Investor

Respondents acknowledge that they raised this argument in their Motion to Dismiss, which

this Court denied.   The Investor Respondents note, however, that they continue to assert

this defense to preserve the record on appeal.   (Investor Resp'ts' Opp'n Mem. at 119 [Doc.

No. 225].)   Not only were Respondents' respective motions to dismiss denied, this Court

has concluded in the instant ruling that genuine issues of fact exist as to Petitioner's

fraudulent transfer and unjust enrichment claims.   Petitioner has therefore stated valid

claims.

Dot Anderson also reasserts an argument on standing that this Court rejected in her

Motion to Dismiss.   She argues that Petitioner is not a "creditor" under the MUFTA.

(Anderson's Mem. Supp. Mot. for Summ. J. at 24 [Doc. No. 24].)   Rather, Anderson

argues that the right to sue under the statute belongs to the creditors of the Receivership

Entities – not the Receiver.   (Id.)   In this Court's Order of June 1, 2011, adopting

Magistrate Judge Franklin Noel's Report and Recommendation denying Anderson's

Motion to Dismiss, this Court concluded that the Receiver had standing to assert fraudulent

transfer and unjust enrichment claims on behalf of the Entities.  (Order of 6/1/11 at 8-9

[Doc. No. 108].)    The Court's ruling on this issue is unchanged.

Accordingly, the Court grants Petitioner's Motion for Summary Judgment as it

relates to Respondents' defenses based on failure to state a claim.

### b.        Estoppel, Waiver, and Laches

Respondents assert the defenses of estoppel, waiver, and laches, arguing that certain

of Petitioner's claims could only have been brought in bankruptcy court.   Because

Petitioner elected to proceed in District Court, Respondents contend that Petitioner's claims

regarding preferential transfer fail.  Petitioner seeks summary judgment in his favor as to

these three related defenses.

In response to Petitioner's summary judgment argument, the Investor Respondents

focus on the Receiver's ability to recoup legal fees, which, they argue, the Receiver would

not have earned, had he "put the Cook Entities into Bankruptcy."  (Investor Resp'ts' Opp'n

Mem. at 120 [Doc. No. 225].)   This argument is irrelevant to the Court's determination of

these defenses.  Substantively, Respondents argue that Petitioner may only assert claims for

preferential transfer in bankruptcy court.  (Id.)  Dot Anderson likewise argues that,

although Petitioner alleges that the transfer Anderson received was "preferential," the law

of fraudulent transfer does not seek to void transfers characterized as "preferences."

(Anderson's Mem. Supp. Mot. for Summ. J. at 11 [Doc. No. 189]) (citing Bos. Trading

Grp., Inc. v. Burnazos, 835 F.2d 1504, 1508-09 (1st Cir. 1987)).

Under the MUFTA, a transfer is voidable because of the fraudulent intent behind the transfer, not because of the preferential nature of the transfer. See Minn. Stat. §§ 513.44(a)(1)-(2 ). Petitioner asserts a claim for fraudulent transfer. As Petitioner notes, the Ponzi presumption may be applied to void transfers made preferentially to insiders. (Pet'r's Opp'n Mem. at 28 [Doc. No. 227] (citing, e.g., Smith v. Suarez (In re IFS Fin. Corp.), 417 B.R. 419, 443 (Bankr. S.D. Tex. 2009)). While the Petition uses the word "preferential," or a variant on the word, e.g., alleging that Respondents "received payments preferentially over hundreds of other investors"(Petition ¶ 36 [Doc. No. 1]), the use of such terminology in the Petition has no substantive effect on Petitioner's fraudulent transfer claim.

Petitioner was free to proceed in bankruptcy court and in the District Court. His claims are neither estopped nor waived by his decision to proceed in District Court. As observed by the court in Scholes, 56 F.3d at 755, "[c]orporate bankruptcy proceedings are not famous for expedition . . . ." This Court made similar observations in the Petters litigation: "The less flexible forum of bankruptcy court is disfavored in circumstances such as these where the economic damage has been caused by fraud, because 'the bankruptcy court would have less flexibility in determining the most equitable approach to distribute assets to victims.'" United States v. Petters, No. 08-CV-5348 ADM/JSM, 2011 WL 281031, at *10 (D. Minn. Jan. 25, 2011).

Respondents' laches defense fails, as they have alleged neither a delay, nor

corresponding prejudice.  See Azalea Fleet, Inc. v. Dreyfus Supply & Mach. Corp., 782

F.2d 1455, 1458-59 (8th Cir. 1986) (observing that, in determining whether laches defense

applies, courts consider whether the plaintiff's delay in filing its suit was unreasonable, and

the degree of prejudice suffered by the defendant due to the delay); Anderson v. First Nat'l

Bank, 228 N.W.2d 257, 260 (Minn. 1975) (noting that prejudice is an essential element of

laches).  As to the estoppel defense, the party claiming estoppel must establish that it relied

on its adversary's conduct to its detriment.  Heckler v. Cmty. Health Servs. of Crawford

Cnty., Inc., 467 U.S. 51, 59 (1984).  Respondents have failed to allege and demonstrate

such reliance.

Anderson further argues that "Basel voluntarily decided to return to Anderson the

funds she provided for investment," therefore, Basel waived its claims against Anderson

and Petitioner/Receiver is estopped from attempting to unwind the transaction.

(Anderson's Opp'n Mem. at 41 [Doc. No. 226].)   The Court finds that the facts here do not

support a waiver defense.  Accordingly, the Court concludes that Respondents' defenses of

laches, waiver, and estoppel fail and Petitioner's Motion for Summary Judgment as it

relates to these defenses is granted.

### c. Failure to Mitigate/Election of Remedies

Petitioner moves for summary judgment as to Respondents' defense of failure to

mitigate/election of remedies.  This defense is related to Respondents' argument regarding

the decision of the Receiver/Petitioner to proceed to litigate his claims in District Court,

rather than to proceed in bankruptcy, and to permit certain "winning investors" to retain

their principal, as Dot Anderson argues.   (Investor Resp'ts' Opp'n Mem. at 120-21 [Doc. No. 225]; Anderson's Opp'n Mem. at 41 [Doc. No. 226].)  For the reasons set forth above, the Court rejects this position and grants Petitioner's motion on this defense.

### d.    Accord and Satisfaction

Respondents assert the defense of accord and satisfaction.   "An accord is a contract in which a debtor offers a sum of money, or some other stated performance, in exchange for which a creditor promises to accept the performance in lieu of the original debt."  Webb Bus. Promotions, Inc. v. Am. Elecs. & Entm't Corp., 617 N.W.2d  67, 72 (Minn. 2000). The satisfaction arises in the performance of the accord – typically the acceptance of money – which discharges the duty of the debtor.  Id.

The Investor Respondents argue that "the Cook Currency Entities received dollar-for-dollar consideration for the funds paid to [the Investor Respondents] by the extinguishment of [the Investor Respondents'] claims against the Cook Currency Entities." (Investor Resp'ts' Opp'n Mem. at 121 [Doc. No. 225].)   Therefore, they argue, the transfers in question constitute the payment of the Cook Currency Entities' contractual debt, which extinguished the debt.  (Id.)   Anderson likewise argues that Basel received a dollar-for-dollar reduction in Anderson's claim when it chose to close her account. (Anderson's Opp'n Mem. at 42 [Doc. No. 226].)   She therefore argues that her request, and Basel's assent, extinguished the parties' claims against each other. (Id.)

An enforceable accord and satisfaction exists if (1) the party, in good faith, tenders an instrument to a claimant as full satisfaction of the claim; (2) the instrument or an

accompanying written communication contains a conspicuous statement to the effect that the instrument is tendered as full satisfaction of the claim; (3) the amount of the claim is unliquidated or subject to a bona fide dispute; and (4) the claimant obtained payment of the instrument. Webb Bus. Promotions, 617 N.W.2d at 73. "The purpose of accord and satisfaction is to allow parties to resolve disputes without judicial intervention by discharging all rights and duties under a contract in exchange for a stated performance, usually a payment of a sum of money." Id.

Under Respondents' theory of this defense, the first element of accord and satisfaction fails to apply. While there are questions of fact as to Respondents' good faith, the focus here is on the good faith of the party tendering the instrument – i.e., the Cook Entities. As the Cook Entities operated a Ponzi scheme, their tender of funds to Respondents was not made in good faith. Further, as to the second element, nothing in the record demonstrates that the transfers were accompanied by a conspicuous statement that made clear that the payments were tendered in full satisfaction of any claim. In addition, as to the third element, at the time Respondents received the transfers, there was not a dispute between the Cook Entities and Respondents. For all of these reasons, the Court finds the defense of accord and satisfaction inapplicable to the facts of this case. Petitioner's request for summary judgment on this defense is granted.

### e.    "Doctrine of Payment"

The Investor Respondents assert a "doctrine of payment" defense, similar to their accord and satisfaction defense, in which they contend that "the Cook Currency Entities

paid the contractual amount of their debt" to the Investor Respondents. (Investor Resp'ts' Opp'n Mem. at 117 [Doc. No. 225].) They argue that Petitioner may not, on behalf of the Cook Currency Entities, now allege that the Investor Respondents are entitled to a lesser amount. (Id.) The Investor Respondents' defense is also premised on their position that the transfers in question were not in furtherance of a Ponzi scheme, but represented the repayment of loans.

While there is little case law addressing this defense, the Court understands the doctrine of payment to provide "that a payment becomes fixed and is not subject to reallocation when a creditor receives the payment and, with the knowledge of all parties, enters it on its books." Cass Bank & Trust Co. v. Lemay Bank & Trust Co. (In re Jostco, Inc.), 166 B.R. 399, 403 (Bankr. E.D. Mo. 1994). The Court finds this defense inapplicable. The "payments" in question were transfers made to Respondents in furtherance of the Ponzi scheme. The transfers did not represent legitimate loan repayments. And, further, the payments were not made with the knowledge of all parties – certainly not the knowledge of other investor-creditors in the Cook Entities. Petitioner's request for summary judgment on this defense is granted.

### f.      Res Judicata, Collateral Estoppel, Merger and Bar

As this Court found, *supra*, Chief Judge Davis' attorneys' fees order is not dispositive of Respondents' good faith defense. Similarly, the Court finds it inapplicable to the defenses of res judicata, collateral estoppel, merger and bar.

Res judicata is an absolute bar to a later claim when: (1) an earlier claim involved

the same set of factual circumstances; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; and (4) the estopped party had a full and fair opportunity to litigate the matter.  State v. Joseph, 636 N.W.2d 322, 327 (Minn. 2001).  Res judicata does not apply here because: (1) the factual circumstances are not the same as between the payment of attorneys' fees in Chief Judge Davis' ruling, and the transfer of the cashier's checks, many of which were unsolicited, here; (2) Respondents were not parties to the prior proceeding, nor are they in privity with the attorneys; Petitioner was likewise not involved in the motion practice relating to the attorneys' fees; (3) there was no final judgment; and (4) the party to be estopped here – Petitioner – had no role in litigating the earlier matter.

As to collateral estoppel, or issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980).  A party asserting collateral estoppel must satisfy the following four elements:  (1) the issue sought to be precluded is identical to the issue previously decided; (2) the prior action resulted in a final adjudication on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action.  Ripplin Shoals Land Co., LLC v. United States Army Corps of Eng'rs, 440 F.3d 1038, 1044 (8th Cir. 2006) (citations omitted).   Here, the issue has not already been decided, and is certainly not identical to the issue that was before Chief Judge

Davis. The prior action did not result in a final adjudication on the merits, and there is no showing that Respondents, who were not parties to the prior action, are in privity with Cook's attorneys. Finally, the party sought to be estopped – Petitioner – did not participate in the attorneys' fees motion practice and could not be considered to have been given a full and fair opportunity to be heard. There is no genuine dispute of material fact with respect to these defenses and Petitioner's summary judgment motion is therefore granted as to these defenses.

### g. Unclean Hands, *In Pari Delicto*, Preceding Breach of Contract

Respondents assert the defenses of unclean hands, *in pari delicto* and preceding breach of contract. Respondents argue that the doctrine of *in pari delicto* applies because all of the other investors in the Cook Currency Entities were equally at fault. (Investor Resp'ts' Opp'n Mem. at 124 [Doc. No. 225]) (citing Brubaker v. Hi-Banks Resort Corp., 415 N.W.2d 680, 683 (Minn. Ct. App. 1987) (observing that "[t]he doctrine of *in pari delicto* . . . holds that 'anyone who engages in a fraudulent scheme forfeits all rights to protection, either at law or in equity.'"); Anderson's Opp'n Mem. at 42 [Doc. No. 226].) "The equitable defense of *in pari delicto*, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." Stephenson v. Deutsche Bank AG, 282 F. Supp.2d 1032, 1065-1066 (D. Minn. 2003) (citing Pinter v. Dahl, 486 U.S. 622, 632 (1988)).

Respondents argue that because Petitioner contends that every investor in the Cook Currency Entities received the same terms, the same documents and statements, but for the

Investor Respondents' relationship with Berg, then the other investors also received repayment of their investments in bad faith. Therefore, Respondents argue, Petitioner should not be allowed to recover on behalf of the Receivership Entities, as all parties were equally at fault.

This argument was rejected by the court in Scholes in which the Seventh Circuit refused to apply the defense to prevent a receiver from bringing fraudulent conveyance actions on behalf of the debtor corporations against third-parties and others who had received funds from the corporations. Scholes, 56 F.3d at 754-55. The court's holding in Scholes was based on the rationale that the appointment of the innocent receiver had removed the wrongdoer from the scene and changed the equities such that the *in pari delicto* doctrine "los[t] its sting." Id. (citations omitted). This Court agrees with that reasoning and finds the defense of *in pari delicto* inapplicable.

Likewise, Respondents fail to point to any facts suggesting unclean hands or that Petitioner breached a contract in connection with this action. For all of these reasons, summary judgment for Petitioner is granted as to these defenses.

### h. Damages by Third Parties

Under this defense, the Respondents argue that Petitioner is not entitled to unwind the Cook Currency Entities, because Trevor Cook and his partners – not Respondents – inflicted the damages to the Cook Currency Entities. (Investor Resp'ts' Opp'n Mem. at 124 [Doc. No. 225]; Anderson's Opp'n Mem. at 42-43 [Doc. No. 226].) As Petitioner notes, however, "[t]he Receiver does not seek compensation for Receivership Entities from

some undefined harm arising from the Ponzi scheme; instead, the Receiver seeks to undo specific fraudulent transfers that [Respondents] received" due to their connections with Cook. (Pet'r's Mem. Supp. Mot. for Summ. J. at 117 [Doc. No. 193].)   The Court finds no issues of fact in dispute as to this defense and grants Petitioner's motion as it relates to this defense.

**i.   Anderson's Additional Defenses Regarding Entitlement to a Lien, Recoupment and Setoff**

This Court has defined the equitable concepts of recoupment and setoff, which can be pled as affirmative defenses and counterclaims, as follows:

> "[R]ecoupment allows a defendant to defend against a claim by asserting, up to the amount of the claim, the defendant's own claim against the plaintiff growing out of the same transaction." 20 Am. Jur.2d, <u>Counterclaim, Recoupment, Etc.</u> § 5 (Apr. 2010); <u>see</u> <u>also</u> Black's Law Dictionary, recoupment (8th ed. 2004).  Conversely, a setoff or offset is "[a] defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."  Black's Law Dictionary, setoff (8th ed. 2004); <u>see</u> <u>also</u> 20 Am. Jur. 2d, <u>Counterclaim, Recoupment, Etc.</u> § 6; 80 C.J.S. <u>Set-off and Counterclaim</u> § 3 (May  2010).

<u>Wells Fargo & Co. v. United States</u>, No. 09-CV-2764 (PJS/AJB), 2010 WL 2814317, at *3 (D. Minn. July 15, 2010).   It appears that Anderson's use of recoupment or setoff contemplates the assertion of a claim in the amount of the transfer, growing out of the "same transaction," namely, the Receiver's action.  Because setoff arises out of a transaction independent of the plaintiff's claim, which is not the case here, the Court finds the remedy of setoff inapplicable.   As the Court has found that genuine issues of fact are in dispute, summary judgment as to the recoupment defense is inappropriate.  Accordingly, Petitioner's motion for summary judgment is granted as to Anderson's setoff defense, but

denied as to Anderson's recoupment defense.

As to Anderson's claim under the MUFTA of an entitlement to a lien to retain any interest in the transferred asset, such a lien is available only to a good faith transferee. Minn. Stat. § 513.48(d)(1). Because this Court has determined that genuine disputes of material fact remain as to the issue of good faith, to the extent that Petitioner seeks summary judgment as to Anderson's lien interest, it is denied.

C.    **Motions to Exclude Experts**

Petitioner moves to exclude the testimony of the Investor Respondents' expert, Steven Adams. In turn, the Investor Respondents move to exclude the testimony of Petitioner's expert, Eric Goldberg. Respondent Dot Anderson takes no position on these motions. Neither expert offers an opinion regarding Anderson.

The Investor Respondents' expert, Steven Adams, offers an opinion as to whether certain statements, facts, and documents in this case should have put a reasonable investor objectively on notice of the fraud or insolvency of the Cook Entities. (Adams Expert Report ¶ 1, Ex. A to Decl. of Russell Rigby [Doc. No. 249-1].) Adams is an Adjunct Professor of Law at the University of St. Thomas Law School, where he teaches Mergers and Acquisitions. (Id. ¶ 8.) He previously worked as a senior advisor to Wayzata Partners, an investment fund manager, and currently serves as chairperson of the board of directors of two portfolio companies controlled by Wayzata Partners. (Id. ¶ 6.) In his work with Wayzata Partners, Adams contends that he structured and participated in the offering of over ten separate private equity funds and hedge funds, during the course of which he met

with prospective institutional and individual investors.  (Id.)  Adams also drafted

documents to open investments in such funds and reviewed documents completed by

investors.  (Id.)

Adams opines that the following information would not have provided notice of

fraud or insolvency to a reasonable investor: (1) representations that investors should

expect a return rate of 10-12% per annum on their investments; (2) representations in the

UBS Forms; (3) representations in the Crown Forex Agreements; (4) representations in the

Oxford Agreements; (5) the absence of any publicly available negative information relating

to Trevor Cook or the Cook Entities; and (6) the circumstances of the Investor

Respondents' distributions.  (Id. at 22.)  Based on his review of the evidence, Adams opines

that all of the Investor Respondents received their distributions of funds in good faith under

the MUFTA, "because there were no facts surrounding the Cook Entities which would have

been available to a reasonable investor sufficient for that reasonable investor to suspect that

the Cook Entities were engaged in a fraud."  (Id. at 22-23.)

Petitioner retained his expert, Eric Goldberg, to rebut the opinion of Adams.

(Goldberg Expert Report ¶ 1, Ex. to Magnuson Daubert Decl. [Doc. No. 246-1].)  Goldberg

is the founder of Croton Point Advisors, LLC, which provides consulting services for the

alternative investment industry. (Id. ¶ 5.)  As part of his work with Croton, Goldberg

reviews and makes recommendations on certain trading styles and strategies, risk

management, reporting, operations and service providers to new and emerging managers.

(Id.)  He also creates due diligence plans and marketing materials for emerging managers.

(Id.)  He has previously worked as a portfolio manager for a multi-manager fund, which consisted of managers who traded foreign exchange, commodity futures, bond futures, interest rate futures, and stock index futures.  (Id. ¶ 6.)  Goldberg disagrees with Adam's conclusions and opines that Cook's foreign currency scheme was "highly unusual and relied on unreasonable assumptions."  (Id. ¶ 65.)  Goldberg's report identifies various circumstances which, in his opinion, "would have put any reasonable person on alert that there were potential problems with the Cook Entities and that the proceeds they received were highly suspect."  (Id.)

As to Petitioner's motion, Petitioner argues that Adams' opinion is not useful to the jury.  Moreover, Petitioner contends that Adams will usurp the role of the jury in evaluating the Investor Respondents' objective good faith.  Petitioner argues that the "reasonable, non-professional investor" standard by which Respondents' good faith defense is evaluated is well within the competency of lay people.

In addition, Petitioner contends, the use of expert testimony regarding a fundamental jury issue creates a significant risk of prejudice, in that the jury would be unduly influenced by Adams' opinion.  This is particularly true here, Petitioner asserts, given Adams' background and the way in which the Investor Respondents have characterized his experience.  In their summary judgment memorandum, the Investor Respondents describe Adams as "a principal and general counsel of a Five-Billion Dollar private equity fund in Minnesota . . . . " (Investor Resp'ts' Mem. Supp. Mot. for Summ. J. at 22 [Doc. No. 202].)  In oral argument, counsel for the Investor Respondents referred to Adams as "a former

general counsel of Wayzata Investment Partners, which is the largest hedge fund in Minnesota, and it's a hedge fund that was created out of a hedge fund that was operated by the Cargill Companies, to give your Honor a sense of how big and significant this company is and with regard to the types of transactions they handle." (2/13/12 Hearing Transcript at 70, Ex. C to Rigby Decl. [Doc. No. 249-3.) In addition, Petitioner argues that Adams is not qualified to testify regarding foreign currency trading and that he offered his opinions under the wrong legal standard.

The Investor Respondents, however, argue that Adams' expert testimony is necessary, particularly as it involves foreign currency trading. (Investor Resp'ts' Opp'n Daubert Mem. at 2 [Doc. No. 253].) They contend that jurors will not understand the intricacies of foreign currency trading, or even be aware of it generally, or of the carry trade specifically. (Id.) The Investor Respondents argue that it cannot be assumed to be within the normal range of knowledge and experience of all potential jurors to determine whether a 12% annual rate of return in the foreign currency market in 2008 would constitute a red flag.

While finding their own expert's testimony useful to the trier of fact, the Investor Respondents move to dismiss Petitioner's expert, Eric Goldberg. They argue that Goldberg lacks experience in currency trading, advising investors dealing with hedge funds, or with the information available to a reasonable, non-professional investor. The Investor Respondents contend that Goldberg not only lacks relevant experience, but that he has conducted no meaningful research and would be unable to assist the jury in evaluating the

112

effect of certain information on a reasonable, non-professional investor.

Opinion testimony from an expert "qualified . . . by knowledge, skill, experience, training or education" is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact" and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The Court, acting as a "gatekeeper," must evaluate whether proffered expert testimony passes muster under Rule 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597-98 (1993), bearing in mind that the touchstone for admitting such testimony is assistance to the trier of fact. See, e.g., Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005). Courts may allow expert testimony only when it is both relevant and reliable, Daubert, 509 U.S. at 597-98, but "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "favors admissibility over exclusion." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). Accordingly, doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011), and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265 (1997)). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." Wood v.

Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

In screening expert testimony under Rule 702, a district court applies a three-part test.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

Furthermore, the subject matter of an expert's opinion must be useful to and beyond the knowledge of a layperson: "Under Minnesota law, expert testimony is necessary only where 'the ordinary layman cannot reasonably possess well-founded knowledge of the matter [,]' as with 'question[s] involv[ing] obscure and abstruse medical factors. . . .'" ADT Sec. Services, Inc. v. Swenson, 276 F.R.D. 278, 316 (D. Minn. 2011) (quoting Willert v. Ortho Pharm. Corp., 995 F. Supp. 979, 983 (D. Minn.1998)); see also United States v. Kime, 99 F.3d 870, 884 (8th Cir. 1996) ("[W]hen the layman juror would be able to make a common sense determination of the issue without the technical aid of ... an expert, the expert testimony should be excluded as superfluous."); Tousignant v. St. Louis Cnty., Minn., 615 N.W.2d 53, 59 (Minn. 2000) ("[W]hen [facts are] within the common knowledge of a lay person, expert testimony ... is not necessary.").

This is particularly true where the applicable standard of proof is evaluated by that of a "reasonable person." In Rottlund Co. v. Pinnacle Corp., 452 F.3d 726, 732 (8th Cir. 2006), a copyright infringement action, the plaintiff appealed from the district court's

denial of its motion for a new trial, arguing that the admission at trial of defendant's expert testimony resulted in prejudice.  Defendant's expert opined on the issue of substantial similarity of expression in the product designs at issue.  <u>Id.</u> at 731.  On appeal, the Eighth Circuit held that expert opinion was not appropriate to establish or rebut substantial similarity of expression because the issue was "'measured by the response of the ordinary, reasonable person to the forms of expression.'"   <u>Id.</u> (quoting <u>Hartman v. Hallmark Cards, Inc.</u>, 833 F.2d 117, 120 (8th Cir. 1987)).

The Eighth Circuit cautioned that "although expert opinion embracing an ultimate issue is permissible under Federal Rules of Evidence 704(a), 'courts must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion.'" <u>Id.</u> at 732 (citing <u>Robertson v. Norton Co.</u>, 148 F.3d 905, 908 (8th Cir. 1998)).  Finding that the expert's testimony added nothing helpful to the jury's consideration of the issues, the court concluded that the expert's opinion should have been excluded.  <u>Id.</u>   The court further found that "[b]ecause experts enjoy an aura of reliability and trustworthiness and it is probable that the disputed evidence persuaded the jury in this close case," the Eighth Circuit therefore remanded to the district court for a new trial.  <u>Id.</u> at 733.

On the other hand, in <u>Roeder v. Lockwood (In re Lockwood Auto Grp., Inc.</u>), 428 B.R. 629, 637 (Bankr. W.D. Pa. 2010), the court permitted expert testimony in a fraudulent transfer claim filed in bankruptcy court against a bank and principal corporate shareholder. In opposition to the bank's motion for summary judgment on the good faith defense, the

trustee proffered expert opinion on what constituted normal banking practice.  Id. at 636-37.  Specifically, the trustee offered the opinion to show that "a reasonable bank should have known that the transaction in question was not within normal banking practices and was therefore suspect, thus triggering an obligation to make an investigation, and to refrain from the transaction if its concerns were not addressed."  Id. at 637.  The court concluded that the expert's opinion was outside the knowledge of laymen, and was "just the sort of technical or other specialized knowledge that would assist the trier of fact in this case."  Id.

As noted, the objective good faith standard applied in fraudulent transfer cases is evaluated from the vantage point of a reasonable person with a background similar to that of the transferee.  See, e.g., Bayou IV, 439 B.R. at 313; In re M & L Bus. Mach., 84 F.3d at 1338-39.  Here, the relevant standard is not that of a bank, the banking industry, or professional currency investors, but that of a reasonable, non-professional investor.  The parties do not dispute this.  (Pet'r's Reply Daubert Mem. at 4-5 [Doc. No. 255]; Investor Resp'ts' Opp'n Daubert Mem. at 4 [Doc. No. 253].)  However, the Investor Respondents pose the theoretical question of whether a 20-year-old college student juror, "selected from across Minnesota," can possibly possess the knowledge necessary to assess what a reasonable, non-professional investor would have done in this case.  (Investor Resp'ts' Opp'n Daubert Mem. at 1-2 [Doc. No. 253].)  The Investor Respondents contend that it is "absurd" and "ludicrous" to expect a jury to be able to make this determination without expert assistance.  (Id. at 28.)  The Court rejects this argument.  Quite to the contrary, ordinary laypersons are fully capable, and arguably best qualified, to apply a reasonable

person standard, or in this case, a reasonable non-professional investor standard. What the jurors will be evaluating here is the investors' good faith – not a complicated securities issue, medical issue, or any number of issues for which expert testimony is useful and necessary. "[A] jury is particularly fitted to answer" a question from the standpoint of "the ordinary prudent man." Walton v. Sherwin-Williams Co., 191 F.2d 277, 285 (8th Cir. 1951) (affirming exclusion of expert testifying about adequacy of warning label on weed killer).

At the hearing on the motions to exclude experts, the Investor Respondents cited the Ninth Circuit's decision in Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 530 (9th Cir. 1986), in which the court held that the exclusion of the plaintiffs' expert testimony on investment "churning" was prejudicial error. However, the subject of the expert opinion in Shad is quite distinguishable from the proposed expert opinion in this case. In Shad, the expert testimony included an opinion on whether the plaintiffs' accounts had been churned. Id. at 529-30. The court concluded that expert opinion was essential because "[c]hurning consists of the conjunction of three complex factors." Id. at 530. "If an expert is not allowed to testify that given statistics evidence excessive trading, the jury is left with meaningless numbers from which they cannot judge the appropriateness of the transactions." Id. The underlying elements of the claim at issue in Shad were properly found to be outside the experience of the typical juror, and expert testimony was appropriate. Here, however, the issue of good faith requires the jury to apply a reasonable, non-professional investor standard – a standard that is well within their experience.

The Investor Respondents also argue that Adams' testimony is critical to explaining the intricacies of the foreign currency market. However, other evidence in the record provides this information, including, importantly Trevor Cook's own testimony. Likewise, as to the Investor Respondents' concern that the jury will be unable to evaluate the reasonableness of the promised rate of return as it relates to the 2008 market, again, jurors may rely on their own experiences as non-professional investors.

While both Petitioner and the Respondent Investors invoke <u>Bayou IV</u>, arguing about whether and why expert testimony was used in that case or not, the <u>Bayou IV</u> opinions before the Court are silent as to the use of expert testimony. <u>See</u> <u>Bayou IV</u>, 439 B.R. 284 at 325; 2012 WL 386275 at *1. Regardless of whether expert testimony was used or not, the court in <u>Bayou IV</u> applied a different standard than applicable here, namely that of a reasonably prudent institutional hedge fund investor. <u>See</u> <u>Bayou IV</u>, 439 B.R. 284 at 313. Therefore, <u>Bayou IV</u> provides no guidance on this issue, and, in any event, this Court is bound to apply and follow Eighth Circuit precedent, which includes the <u>Rottlund</u> decision. That decision, albeit in a copyright infringement action, directly applies to the question of a jury's competency to apply a "reasonable person" standard. <u>Rottlund</u>, 452 F.3d at 732. Finding that the jury was not only competent to apply such a standard, the Eighth Circuit further found that the expert's testimony may have prejudiced the jury, given the tendency of experts to have an "aura" of reliability and authority. <u>Id.</u> That concern applies equally here.

The Court therefore finds that the opinion of the Investor Respondents' expert,

Steven Adams, is not helpful to the trier of fact, could usurp the jury's role and could be, in fact, prejudicial. His testimony is therefore excluded. Having reached this conclusion on these grounds, the Court does not address Petitioner's other arguments for the exclusion of Adams' opinion. Because the opinion of Petitioner's expert, Eric Goldman, is offered to counter that of Steven Adams, Goldman's testimony is therefore unnecessary. For that reason, the Court need not evaluate the various additional arguments regarding Goldberg's proffered opinion.

**D.     Order to Show Cause**

Various submissions of the parties in support of their motion papers were filed under seal. If the parties believe that any portion of this Order warrants redaction, the Court orders the parties to show cause ten days from the date of this Order, stating why the Order should not be unsealed and specifying any portion of the order warranting redaction.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Respondent Anderson's Motion for Summary Judgment [Doc. No. 187] is **DENIED**;

2.     The Investor Respondents' Motion for Summary Judgment [Doc. No. 200] is **DENIED**;

3.     Petitioner's Motion for Summary Judgment [Doc. No. 192] is **GRANTED IN PART, AND DENIED IN PART**, as set forth herein;

4.     Petitioner's Motion to Exclude Expert Testimony [Doc. No. 228] is **GRANTED**;

119

5.   The Investor Respondents' Motion to Exclude Expert Testimony [Doc. No. 231] is **GRANTED**; and

6.   The parties are ordered to show cause ten (10) days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.


Dated:    September 27, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge